BELLERIVE COUNTRY CLUB, a nonprofit, pro forma decree corporation, Appellant, v. HOWARD McVEY et al., Respondents, No. 44092—284 S. W. (2d) 492.

Court en Banc, November 14, 1955.

Rehearing Denied, December 12, 1955.

478

*John R. Stockham* and *Benjamin Roth* for plaintiff-appellant; *Stockham, Roth, Buder & Martin* of counsel.

*Harry H. Craig* and *Norman W. Armbruster* for defendants-respondents; *Wiley, Craig, Armbruster, Schmidt & Wilburn* of counsel.

480

[494]  CQIL, C.—Bellerive Country Club, a nonprofit, pro forma decree corporation, brought an action for an injunction to restrain and enjoin alleged unlawful picketing at its club entrance and for actual and punitive damages. The club has appealed from a judgment denying relief. We shall refer to the parties as they were designated in the trial court.

Plaintiff, a private club in St. Louis County, with a membership of about 300 families, furnished golfing, swimming, tennis, dining, and other entertainment facilities to members and their guests. Plaintiff regularly employed about 30 persons, about 20 of whom were busboys, waiters, cooks, groundskeepers, and locker attendants, of whom only one was a union member.

Individual defendants, other than Howard McVey, were officers and members of defendant [495] St. Louis Joint Executive Board of the Hotel and Restaurant Employees and Bartenders International League of America, A. F. of L., and of the Bartenders, Waiters, Cooks, Waitresses, and Miscellaneous Hotel Employees Unions, comprising

the Joint Executive Board, who were sued individually and as representatives of a class consisting of the entire membership of Locals 26, 50, 51, and the Local Joint Executive Board and its affiliates.

There was no evidence that, and it does not otherwise appear that, interstate commerce was involved or affected by any of the activities here considered. We have appellate jurisdiction because the construction of Art. I, Sec. 29, Mo. Const. 1945, is involved.

Plaintiff alleged that one of the objectives of the picketing was "to compel the plaintiff to induce or coerce its employees into becoming members of and to select Locals 51, 26, 60[50], the Local Joint Executive Board or its affiliates as their collective bargaining representatives which would be unlawful under Sec. 29, Art. I of the Constitution of Missouri, 1945."

Defendants pleaded that "the purpose of the picketing was to inform the public generally of the fact that plaintiff's employees were non-union; * * * for the purpose of advocating the cause of union labor, and for the purpose of promoting defendants' lawful interests as well as the interests of plaintiff's employees"; and defendants denied that the picketing was unlawful in any respect alleged in plaintiff's petition. None of the defendants testified, and none of defendants' evidence directly concerned the objectives of the picketing. We examine all the evidence to determine whether plaintiff's proof sustained its charge that an objective of the picketing was unlawful in the respect noted.

The evidence (or in some instances the admissions or agreements of the parties) showed that in the spring of 1952, defendant Sorbie and another union representative called on the president of plaintiff club and informed him that certain unions, including theirs, had recently organized the employees of the Norwood Hills and Glen Echo Country Clubs and that they wished to discuss the status of plaintiff's employees. They admitted that they did not represent a majority of plaintiff's employees but felt that they would, and wanted to know plaintiff's attitude toward unionization. Plaintiff's president replied that if "our people wanted a union, we would have a union and have a contract; if the majority didn't want a union, then, of course, I wasn't going to deal with them. As far as I was personally concerned, I hoped our people didn't feel that they wanted or needed a union; that we had very satisfactory relations with our employees, many of whom had been there twenty to thirty-five years; that we tried to pay proper wages." It developed in the conversation that plaintiff had recently raised employee wages and Mr. Sorbie thought that a "bit unfair." The president explained the club policy as to wages by stating that plaintiff did not wish to lose employees because of inadequate wages and that when he, as president, heard that other clubs were paying higher wages, plaintiff had always increased its rates, and that it intended to continue that policy and practice. It also developed

that some of plaintiff's employees were said to have commented to employees of other country clubs to the effect that they (plaintiff's employees) did not need a union and did not see why other club employees had joined one. Plaintiff's president replied he did not know that had happened, and that, while he could not tell his employees what to do when they were away from the club, he would tell them that he thought it unwise for them to "get into other people's affairs." Mr. Sorbie asked if union representatives would be permitted on the club grounds to talk with plaintiff's employees; to which question plaintiff's president replied that he could not grant such request because plaintiff was a private place, that only members and guests or deliverymen were allowed on the grounds, and that if union representatives were permitted to come on the grounds for the purpose of talking union, it would indicate to the employees that the club president [496] felt that plaintiff's employees should join the union. He further said there was no objection to union representatives talking to the club employees either at the club entrance or at the homes of the various employees.

Soon after the above conversation, plaintiff's president informed the club employees of his meeting with Mr. Sorbie and related to them the substance of the entire conversation. He also informed them that it was "up to them entirely whether they should join a union, or not." He said so far as plaintiff was concerned the matter of joining a union was still (at trial time) "up to the employees"; since the establishment of the picket line, a number of the employees have said to plaintiff's president that they did not want a union and that, in answer, he reiterated that "it was entirely up to them."

For the week of May 26, 1953, the club premises had been "turned over" to the District Golf Association for the purpose of holding the Western Open Golf Tournament. As tournament manager, plaintiff's president arrived early on the morning of the 26th and found a single picket walking at the club entrance carrying a "sandwich board" sign which said "Non-Union Employees" and which bore some other words indicating that the employees were nonunion. Since May 26, there has been one picket at the club entrance (except for the week of the golf tournament when, at times, there were more than one) from 7 a.m. till 8 p.m. The picketing has been peaceful at all times and the conduct of the individual pickets, "exemplary."

Plaintiff was not consulted or notified by defendants or any other person or organization that the picket line was to be established. Plaintiff's president had had no contact with any of the defendants other than the meeting in the spring of 1952 and was never informed as to the objective of the picket line. He understood from his (plaintiff's) counsel that the unions contended it was "an advertising line."

Plaintiff's evidence was that the picket line stopped all deliveries to the club by union drivers; that none of its regular suppliers had made a delivery since the picket line. Although defendants' pickets

testified that ten or more trucks had crossed the picket line, there was no testimony as to whether the drivers of these trucks were union members. The picket line made it necessary for the club to obtain its regular supplies in various ways, viz., by using a club truck to pick up supplies at certain suppliers' establishments; in other instances, the suppliers would not permit this and it was necessary for the club to use its truck to pick up supplies at various stores where the club purchased them at retail. (These retail purchases of food items were made almost every day and sometimes two or three times a day.) In some instances, the owners of supplying firms would deliver supplies in the owner's private automobile; and at other times merchandise for the club was delivered to some other address. It was necessary to hire a new employee, a son of one of the members, at $1.25 an hour for a 40-hour week, to operate the club truck for the sole purpose of picking up club supplies which theretofore had been delivered by the suppliers to the club building. There was evidence that this truck, a 1946 Ford, had traveled about 23,000 miles from 1946 until the establishment of the picket line, and that, since the picket line to time of trial (about 6 weeks), the truck had been driven about 4,500 miles. In several instances, the club manager had placed orders with regular suppliers in the week preceding trial, which ordered merchandise was placed in the hands of the respective drivers but which, in each instance, was not delivered. Prior to the picket line, gasoline used by club vehicles was delivered to the club each Friday. Since the picket line, there had been no deliveries of gasoline and it had been necessary to buy it at filling stations at retail prices. Prior to the picket line, ice was delivered and placed in the various receptacles in the club by the drivers for the ice suppliers. Since the picket line, the club truck has picked up the ice at the supplier's establishment and it has been necessary for various club employees to stop performance of their regular duties to [497] assist in placing the ice when it arrives at the grounds in the club's truck. In order to receive a certain butcher block and table which had been ordered by the club and which was in the hands of a motor freight line, it was necessary to make the delivery to the home of one of the club employees.

There was evidence adduced by plaintiff for the limited purpose of showing the reasons which the suppliers expressed to the club for their failure to make deliveries of supplies as had been done prior to the establishment of the picket line. Anheuser-Busch explained that their drivers could not cross picket lines and that the club could not pick up supplies at the brewery because the company practice and policy was to prohibit picking up by customers where deliveries could not be made because union drivers would not cross a picket line. Falstaff brewery informed the club that its position was the same as that of Anheuser-Busch, noted above. The president of the club wrote a letter to City Products Company, the regular ice supplier for the club,

informing it that it had failed to deliver a specific order and asking the reason therefor in the light of a statement ascribed by the letter to Mr. John Easton who, according to the letter, was in charge of the picket line and who, again according to the letter, had stated that the picket line "is not there for any purpose other than to advertise that the employees of the club are non-union, and that therefore it's not there to stop any deliveries of any kind." City Products Corporation answered by a letter in which it was stated that the regular deliveries of ice to the club were stopped "when a picket line was formed around the Country Club, and our drivers would not make a delivery. A definite order was placed on June 19th for a delivery to be made on June 20th. The driver attempted to make the delivery, but was stopped by the picket line. He, therefore, did not make the delivery. We have questioned the driver since, and he informs us that he had taken this delivery up with his union; and he was told by his union that he would be fined if he would cross this picket line."

The driver for the So Good Potato Chip Company, who before the picket line called at the club each Thursday, obtained an order and delivered it each Friday, arrived at the club during the Western Open with merchandise for delivery. When he saw "the man with an umbrella" he kept on going without making the delivery and had made no delivery to the club since, although he had sold potato chips to the club on a parking lot near a Kroger store. This driver said that he did not know what unions were conducting the picket line, did not recall what the picket sign said, and did not know the purpose of the picket line. He was a member of Local 611, affiliated with Teamsters A. F. of L. In answer to a question as to why he did not cross the picket line, he said "I don't suppose there was any definite reasons. There was just an impulse there. I saw the man, and I kept on going." And the only reason he has not made deliveries was because the picket line was there. The club manager had testified that this driver had told him that he (the driver) would be fined if he delivered orders to the club. The driver denied this statement and testified that he had received no instructions from his union as to whether he should or should not cross that or any other picket line.

The driver for McFarland Brothers Wholesale Meat Company, a regular supplier of the club, a member of Local 700, affiliated with Teamsters A. F. of L., testified that the first and last time he personally had occasion to take an order to the club was about two weeks prior to the trial; that he saw the picket there and asked who was on strike; that the picket replied, "the Cooks and Bartenders," and further said, "You can go in if you want to"; that "He wouldn't stop me, but he would just turn the number in on the truck." The driver did not deliver the order and had made no delivery since. On cross-examination, this driver was not certain that the picket said that

someone was "on strike" or whether he simply said that the people at the club were nonunion.

The driver for the Mar Meat Company, a member of Local 700, affiliated with [498] Teamsters A. F. of L,. testified that he was instructed to deliver an order to the club about two weeks prior to trial time. He did not make the delivery because he saw the umbrella and "I didn't want to cross the picket line." He called the company "and they said 'Bring it back.' Q Did you have any reason that you do not cross picket lines? A Just my own. Q What is your reason? A I didn't want to—I am a union man."

The driver for the Old Vienna Company, a member of Local 611, affiliated with Teamsters A. F. of L., arrived at the club with ordered merchandise about two weeks before trial. He asked the picket if anybody was delivering. The picket replied, "No, but if you want to go in you could go in; that it was up to you." And the picket told him that "they were on strike." So he did not deliver the merchandise. "I just used my own judgment and didn't [cross the picket line] for my own reason." He did not remember what words were on the sign or the umbrella.

A contract between the club and some union musicians, by the terms of which the musicians had agreed to furnish music at a club dance scheduled for May 30, was not fulfilled. The orchestra leader who had signed the contract, testified that he found out there was a picket line about three days prior to May 30; that he did not play the engagement because, "Well, first of all, I have never crossed a picket line in my life; and the second reason was, that I wanted my own union to check on it and find out whether the strike was being observed, and so forth. * * * My first information was, it was a personal issue, and I could cross it if I wished to. And I said (to the witness's union representative), 'Well, based on that thing (a signed contract), do you think it would be all right to cross it?' he said, 'Well, I suppose so.' * * * I said, 'Well, I probably will.' He said, 'Do you know the full case on it?' I said, 'Well, no, I don't know the full case about it. Does any one know it?' Anyway, after much talking he didn't think it would be a good idea to cross the line, he said 'although I can't tell you what to do. I would rather leave it up to your own judgment whether you think you should or should not cross the line.' So I do a lot of work with a lot of union people, and I didn't want to be the one to set a precedent as an orchestra leader and cross that line." In answer to a quesion as to why he had never crossed a picket line he said, "Well, I think it is injurious to myself as a union member, and I might participate in doing something that would hurt another union of which I am a member. That is a part of a principle. Rather than rational thinking, it is part of a principle."

The evidence further showed that despite the picket line, the club dance scheduled for May 30 was held and recorded music was used,

and that a July 4th dance was held at which a nonunion band composed of college students played. The Western Open Golf Tournament was conducted despite the picket line, although there were many resulting inconveniences. The club has continued to operate and there has been no appreciable decline in the members' use of the club, although one member canceled a scheduled wedding reception for his daughter because he was fearful that the facilities would be inadequate because of the picket line, and for the further reason that he did not want his own company's labor relations to be affected adversely. The club had on hand substantial inventories of staple food items and of liquor and has been able to obtain other necessary supplies by the methods heretofore indicated.

The evidence also showed that certain canvas tents which had been erected on the club grounds prior to the picket line, for use at the Western Open by a company employing union drivers, were removed after the establishment of the picket line and after the company had obtained permission for its union drivers to go into the club grounds and remove the tents. It also appeared that although Coca Cola drivers were thought to be nonunion, that company will not permit its drivers to cross a picket line. The one plaintiff's employee who was a union member had worked regularly despite the picket line. A driver for the Railway Express Agency, a member of Local 610 affiliated with Teamsters A. F. of L., crossed [499] the picket line on July 1 and delivered a golf bag to the club golf professional after he had obtained permission from the picket. The driver said "I never cross a picket line without first inquiring," and further stated that he had been subpoenaed as a witness before he made the delivery to the club; that he did not know the objective of the picket line and, as his reason for not crossing picket lines without the consent of the pickets, said "* * * I don't know, that is just one of the things, when there is a picket line, I don't have to cross it. * * * If they give me permission, fine, I will deliver it, but if not, I won't. * * * I don't have to if there is a picket line out there. I am a union man; regardless of if I am working or not working, I don't go through a picket line. * * * They [the picket] are out for something; they are trying to organize the men or something; they are out there for more money; they are out there for a reason. Q And, therefore, you will not cross the picket line? A That is right. Q Even though you don't know the reason for the picket line? A That is right."

The two pickets denied that they had told anyone that the club employees were on strike and said that they had never used the words "on strike." One of the pickets had answered one driver and the other had answered questions by two drivers, each by telling them, in accordance with their instructions, to call the union office.

Defendants' evidence showed that in certain instances unions instruct their members to cross "organizational" picket lines, and that

union members do at times cross such picket lines. Whether the instances referred to are those in which a clause in a particular contract makes such instructions by unions and the subsequent action by its members necessary, was not entirely clear from the evidence. It was customary for union pickets to record and turn in to the union the license numbers of vehicles crossing a picket line.

From all the foregoing, it is fair to say that these facts are undisputed or are clearly shown by the record: The picketing was carried on by one picket at a time at the only club entrance; the conduct of the pickets was at all times "exemplary"—in short, the picketing was peaceful and the manner of picketing was untainted by any unlawful or objectionable conduct on the part of the pickets; there was no dispute between the plaintiff and its employees; the wages, hours, and working conditions of plaintiff's employees were not shown to be below the union standard for like employees—in fact, the only evidence on the subject was that the wages paid by plaintiff equaled those paid similar union employees in nearby country clubs; there was no definable dispute, as such, between defendants and plaintiff's employees, other than a possibly inferable difference of personal opinion between them as to the desirability of the employees joining any or a particular union; no effort had been made by defendants to solicit plaintiff's employees for union membership, either before or since the picketing, except as the picket line itself may have amounted to a form of solicitation; the picketing was "stranger" picketing; and plaintiff was a pro forma decree corporation, not in competition with any other club or business.

We note again that no witness testified as to the objective of the instant picketing. None of the individual defendants, some of whom were admittedly responsible for the picketing, and who presumably had personal knowledge of the real purpose of the picketing, took the stand to state its objectives or to support the pleaded objectives.

And we think it is also fair to say that the picket line was established under these circumstances: Defendant Sorbie and another had called on plaintiff's president to discover plaintiff's attitude toward unionization of its employees. These representatives discovered that, while plaintiff's president personally hoped plaintiff's employees would not wish to become unionized, he, nevertheless, made clear that plaintiff would be governed, with respect to their unionization, by the wishes of its employees. So far as the evidence shows, neither plaintiff nor defendant did anything with reference to the unionization of plaintiff's employees subsequent to the meeting in the spring of [500] 1952. Yet despite complete inaction for about a year defendants chose to establish a picket line on the very day the Western Open Golf Tournament was to open at the club.

We think there can be no doubt, from a review of all the evidence, that defendants knew or should have known that a picket line,

irrespective of its validity or purpose, would inevitably result in cutting off regular deliveries of at least a large portion of necessary supplies to the club; and that defendants knew or should have known that such would have an adverse effect upon the efficiency of, and the cost of, the club's operations. And it follows that the establishment of the picket line, with knowledge of its inevitable effect, is persuasive evidence that defendants intended that the picket line have that effect. The proof is abundant that the picketing did have that effect, in that it did cause an increase in the cost of operation, some inefficiency and inconvenience, and in general created an undesirable situation from the club's standpoint—a situation over which the club apparently had no control.

We think it is clear that the right guaranteed to employees by Art. I, Sec. 29, Mo. Const. 1945, "to organize and to bargain collectively through representatives of their own choosing" is a free choice, uncoerced by management, union, or any other group or organization, so that picketing with an objective in violation of that guaranty must be regarded as equally unlawful as where coercion to violate a statute is involved.

The parties agree and we have held that peaceful picketing may be enjoined if one of its objectives or purposes is unlawful. Katz Drug Co. v. Kavner, Mo., 249 S. W. 2d 166, 170 [7-9]. The difficulty is that it appears to us that "organizational" or "advertising" picketing usually, if not always, has the effect, to some extent, of tending to cause the employer, in order that he may avoid the hardship, loss, and inconvenience imposed upon him as the comparatively innocent middleman, to be tempted to persuade his nonunion employees to join a union. And where, as in the instant case, the evidence is such as to compel the inference that the picketing union knew or should have known that one effect of the picketing would, as it did, cause an increase in the cost of the club's operation, and would, as it did, result in the club's inefficient and inconvenient operation, it reasonably may be said that in one sense one of the objectives or purposes of the picketing was to coerce the employer to violate the employees' constitutionally guaranteed right of free and uncoerced choice "to organize and to bargain collectively through representatives of their own choosing" and thereby was an unlawful objective.

We think, however, that the total problem involved is not so simple of solution. Surely such an inflexible application of the meaning of Art. I, Sec. 29, Mo. Const. 1945, as above suggested would, in some circumstances, effectively and unconstitutionally deny the right of free speech involved in peaceful picketing. And while we appreciate the fact that picketing is not necessarily the legal equivalent of free speech (Hughes et al. v. Superior Court of California, 339 U. S. 460, 465; International Brotherhood of Teamsters, etc. v. Hanke et al., 339 U. S. 470, 474) and that peaceful picketing, under certain cir-

cumstances, may be enjoined without violating the constitutional guaranty of free speech (Giboney v. Empire Storage & Ice Co., 336 U. S. 490, 93 L. Ed. 834, 69 S. Ct. 684), still the free speech involved as an element of communication in peaceful picketing may not be denied solely because an effect of certain, otherwise permissible, picketing may be to tend to bring about a violation of a provision of our state constitution.

As we understand, before the right of free speech inherent in peaceful picketing may be denied, there must be some clear showing that one of the "objectives" of the picketing is unlawful or that to permit peaceful picketing under the particular circumstances would cause such harm to others as to outweigh, as a matter of public policy, [501] the desirability of permitting the peaceful picketing even though to enjoin it denies one of its ingredients—free speech.

It would appear, therefore, that a proper interpretation and application of Art. I, Sec. 29, Mo. Const. 1945, and the solution of this case calls for a distinction between a "purpose" or an "objective" of picketing and the "effect" of the picketing conducted for a lawful "purpose." That is to say that solely because the "effect" of the picketing in the instant case may have had a *tendency* to cause the employer to violate his employees' constitutional right of free and uncoerced choice, it does not inevitably follow that one of the "objectives" or "purposes" of the picketing was unlawful. But the same reasoning process leads to the conclusion that under some circumstances it may appear that the "effect" of peaceful organizational picketing is in fact inseparable from and amounts to one of its "objectives."

Thus where, as here, the evidence considered as a whole discloses no reasonable "objective" other than to accomplish the "effect" which the picketing had, it would be entirely unrealistic to hold that the object of the "organizational" or "advertising" picketing instantly involved was other than to affect so adversely the club's operation as to cause the employer to intervene and coerce its employees into union membership. We think the conclusion that such was the real objective of the instant picketing is inescapable under the facts. While, as twice noted, defendants did not offer proof of the purpose or objective of the picketing, they pleaded and now contend that the sole objective was to advertise the fact that plaintiff's employees were not members of the union and thereby through the influence of public opinion cause plaintiff's employees to be unionized. There are facts and circumstances which convince us to the contrary.

It is of some importance to make clear the nature of the entity, here the plaintiff. It was and is a private country club. It is its members, operating a club for themselves and their guests. It is not in competition, in an economic sense, with any other business or enterprise. Thus, in determining the objective of instant picketing, we bear

in mind that the same conduct which, when done in connection with a competitive business, might be construed as not indicating an unlawful objective, bears a different interpretation when considered in connection with a noncompetitive, noncommercial, private club.

We note that advertising to the public, by means of picketing the entrance of a country club (a noncompetitive pro forma corporation), where the picket carried an umbrella bearing the word "nonunion", was patently not designed to have any substantial effect on public opinion. Obviously the advertising medium employed was not one calculated to reach any appreciable number of persons. It is certain that there were other advertising media through which a substantial, rather than an insubstantial, number of persons would have been advised that plaintiff's employees were nonunion.

This is not to say that defendants were bound to choose any particular method to advertise the fact of plaintiff's employees' nonunion status to the public or that they could not choose an ineffective medium. The significance of their having employed an ineffective advertising method, lies in the fact that their choice of media amounts to a compelling indication that the real objective of the picketing must have been something other than to inform a relatively small segment of the public that plaintiff's employees were nonunion. And while we recognize the fact that the manner in which public opinion may be aroused and the effect of that public opinion, are often nebulous and intangible, still we think the facts in evidence demonstrate that transparently the importance of the publicity ingredient of the instant picketing was infinitesimal.

And then there is this further circumstance: that no publicity to the public took place for a year after defendants had the [502] same knowledge concerning plaintiff and its employees as they had when the picketing began; that during this interim, so far as the record shows, no effort was made by defendants to persuade plaintiff's employees to the cause of unionism, either by personal interviews or by advertising the fact of plaintiff's employees' nonunion status to the public, by picket signs, or otherwise; and that the picket line was established on the very morning a large golf tournament was to be conducted on plaintiff's premises. Again, this is not to say that defendants were bound to pursue any particular course or observe any particular timetable in their organizational efforts. It is to say, however, that the background of, and the circumstances under which, the picket line was established are again compelling indications that the real objective must have been something other than to arouse public opinion and thereby persuade plaintiff's employees to the cause of unionism.

Further, there is the fact that no defendant took the stand to support the pleaded objective of the picketing. This is a circumstance properly considered. We agree with defendants that plaintiff had the burden of proof but, under all the circumstances shown in evidence

by plaintiff, we think the total silence of individual defendants is a significant circumstance to be considered and which, in the setting of this case, supports an inference unfavorable to defendants as to the objective of the picketing.

When the foregoing circumstances and others heretofore mentioned in the statement of the evidence are considered, we think only one reasonable inference is supported, viz., that the instant picketing was not in fact "organizational" or "advertising" picketing but was, and was intended to be, a form of picketing, whatever its label, which had as its objective to affect adversely the plaintiff's continued normal operation and to attempt thereby to cause plaintiff to intervene and to attempt to coerce its employees into union membership. We reach this conclusion because, as we view it, the evidence supports it and does not support any other reasonable conclusion.

We should make clear, however, that we do not hold that peaceful "organizational" or "advertising" picketing should be enjoined solely because its effect may be to tend to cause the employer to intervene and attempt to coerce the employees into union membership. We think that where the reasonably discernible objective of peaceful "organizational" picketing is to persuade employees to join a union, such picketing is not in violation of Art. I, Sec. 29, Mo. Const. 1945, even though an "effect" of such picketing may have a natural tendency to cause the employer to coerce his employees into union membership. Cf. Pappas v. Stacey (Sup. Jud. Ct. of Maine), 116 A. 2d 497 (review denied by U. S. Sup. Ct., Oct. 24, 1955, Case No. 336). And we do not hold that peaceful "organizational" picketing becomes unlawful solely because one result of that picketing is to cause suppliers and the public to refuse to cross the picket line. Missouri Cafeteria v. McVey, 362 Mo. 583, 592, 242 S. W. 2d 549, 552. We do hold, however, that where it clearly appears from all the evidence and circumstances in a given case that the "objective" is the same as the attempted "effect", i.e., where the real purpose is to attempt to cause the employer to bring pressure upon its employees to join a union, the peaceful picketing involved is in fact not "organizational" picketing but thereby becomes a form of picketing for the purpose of accomplishing an unlawful objective and should be enjoined. (We do not reach the question of when, if ever, peaceful "organizational" or "advertising" picketing, as such, is enjoinable even though its objective is not in violation of law where the effect of such picketing is to cause such severe economic hardship to a helpless employer as to be not justified by any relatively substantial interest of the union.)

We have examined the many cases and other authorities cited by the parties. No purpose would be served by reviewing them here. We should be less than frank were we to say that they are readily, if at all, reconcilable. And, certainly, we do not go [503] beyond the facts and circumstances of this case.

We recognize that plaintiff had the burden to prove by clear and convincing evidence the unlawfulness of an objective of the instant picketing. This burden may be met by circumstantial evidence. From what we have said heretofore it is apparent that we think plaintiff has satisfied its burden of proof.

■ Individual defendants agree that the trial court had jurisdiction of them. It appears that plaintiff's action was against defendants as individuals as well as against them as representatives of classes consisting of "the entire memberships of Locals 51, 26, 50 and the Local Joint Executive Board and its affiliates." Defendants in their return and answer, denied that the named defendants adequately and fairly represented the named classes. Plaintiff adduced no evidence that individual defendants were "fairly chosen and adequately and fairly represent the whole class" as required by Supreme Court Rule 3.07(a). Consequently the injunction to be entered should be directed against individual defendants in their alleged and admitted representative capacities but not specifically against the classes alleged to have been represented by individual defendants. And the injunction should be tailored so as to prevent picketing which has for its objective an attempt to cause plaintiff to coerce its employees to join a union.

■ As noted, plaintiff, as ancillary to injunctive relief, sought actual and punitive damages. It has been generally held that equity will not award punitive damages. 25 C.J.S., Damages, § 117, p. 709. We have found no Missouri case on the proposition. It is, however, the law in Missouri that the allowance of punitive damages is always discretionary. Mitchell v. Pla-Mor, Inc., 361 Mo. 946, 237 S.W. 2d 189. Consequently, without holding that a court of equity may never award punitive damages, we are of the opinion that the proper exercise of a sound discretion prevents the assessment of punitive damages under all the evidence in the instant case.

The judgment is reversed and the cause remanded for the assessment of actual damages and the entry of a decree and judgment in accord with the views herein stated.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the Court en Banc. All concur.