TALLMAN COMPANY, a Corporation, Appellant, v. WILLIAM LATAL, HAROLD J. GIBBONS, ERNEST CONN, BRYON TREFTS, WOODROW WILSON, JOHN NEDICH, CLIFFORD J. HILLER, JOHN D. HALEY, WILLIAM A. MORRIS, R. L. POLLARD, and LESTER SLAYTON, Respondents, No. 43437—284 S. W. (2d) 547.

Court en Banc, November 14, 1955.

Rehearing Denied, December 12, 1955.

*John R. Stockham, Eugene H. Buder* and *Benjamin Roth* for appellant; *Stockham, Roth, Buder & Martin* of counsel.

554

556

*Harry H. Craig, Norman W. Armbruster* and *Wiley, Craig & Armbruster* for respondents; *Wiley, Craig, Armbruster, Schmidt & Wilburn* of counsel.

[548] WESTHUES, J.—This suit was filed in the Circuit Court of St. Louis County, Missouri, by plaintiff, a corporation engaged in selling at wholesale plumbing, heating, and mill supplies, to enjoin [549] the picketing of its place of business and for damages alleged to have been caused to its business by such picketing. The trial court after an extensive hearing on the question of whether the picketing was lawful took the case under advisement. While the case was thus pending, the picketing was discontinued and the trial court dismissed plaintiff's petition. Plaintiff corporation appealed from that judgment.

The defendants are members, officers, and agents of Warehousemen, Loaders, Stackers, and Graders, Local Union 688, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, of the A.F.L. The action is brought against defendants individually and as a class. We shall refer to defendants as Local 688.

The case on appeal was first submitted in Division II of this court in September, 1953. On March 8, 1954, in an opinion by Judge Leedy, the cause was remanded with directions for a hearing on the question of damages. On June 14, 1954, the cause was transferred to the Court en banc where in October, 1954, it was argued and submitted. On March 1, 1955, the court set aside the submission to await the decision of the Supreme Court of the United States of the case of Anheuser-Busch, Inc. v. Weber. Another compelling reason for the court's action was the number of changes in the personnel of this court. The case was reargued and resubmitted on September 27, 1955. The case of Weber v. Anheuser-Busch, Inc., 348 U. S. 468, 75 S. Ct. 480, had then been decided and published. That case and the case of United Construction Workers v. Laburnum Construction Corp., 347 U. S. 656, 74 S. Ct. 833, decided June 7, 1954, were cited by plaintiff and the defendants in the supplemental briefs filed for the September, 1955, hearing. Those cases have a material bearing on the issues of law involved on this appeal. It is, therefore, desirable to write a new opinion even though the result will be the same as that in the opinion in Division II.

Plaintiff contends that even if the trial court was justified in denying injunctive relief because of the mootness of that question, the trial court should have heard evidence on the question of damages. Plain-

tiff argues that the picketing was unlawful and in addition was conducted in an unlawful manner and had it not been that the question of the injunctive feature became moot, the trial court would have been justified in granting injunctive relief.

The defendants say that the picketing was lawful and peaceful and, therefore, plaintiff is not entitled to any relief. Defendants also say that if it should be held that the picketing was unlawful and conducted in an unlawful manner, the state courts have no jurisdiction and the Federal Board, particularly the N.L.R.B., has exclusive jurisdiction of the subject matter.

For a better understanding of the case, it may be well to relate briefly the principal events which brought about this litigation. Prior to January 1, 1952, Local 688 was the bargaining agent representing the employees of thirteen wholesale plumbing houses in the St. Louis territory. The contract expired December 31, 1951, and on failure of the parties to agree on terms of a new contract, a strike was called on January 2, 1952, of the employees of these houses belonging to Local 688. There were twelve other such establishments whose employees were not represented by Local 688 as a bargaining agency. At the time the strike was called, picket lines were placed at all of those twelve business houses as well as at the thirteen houses represented by Local 688. The plaintiff Tallman Company, which was one of those not so represented, employed two union truck drivers who were represented by Local 682 as bargaining agent. Of its 23 employees, only 12 or 13 of the Tallman employees were eligible to membership in defendants' Local 688. The pickets carried signs and distributed leaflets. The view we take of this case renders unnecessary our setting forth the contents of these leaflets and the wording of the signs.

[550] Plaintiff, on March 4, 1952, filed its petition asking that the picketing be discontinued and for damages. A hearing was held March 20-22, 1952, and the trial court took the case under advisement. On April 2, 1952, an election of the employees of plaintiff resulted in their choosing the Tallman Employees Association as their bargaining representative. On April 10, 1952, the N.L.R.B. approved the selection. Local 688 thereupon removed the picket lines. On June 9, 1952, the trial court entered its decree dismissing plaintiff's petition. The picketing having been discontinued rendered moot the injunctive feature of the case and the trial court was justified in so treating that question. However, during the trial, it was stipulated that the question of damages as prayed for by plaintiff should be tried at a later date. Note a portion of the agreement as stated by defendants' attorney:

"MR. CRAIG: It is stipulated by and between the parties to this cause that the issues of the case relating to damages may be continued for later hearing, and that in so doing neither the plaintiff nor the defendants will waive any rights that they might otherwise have had."

If the trial court did not have jurisdiction of the subject matter, then, of course, it rightly dismissed plaintiff's petition including the claim for damages. We must therefore determine the question of jurisdiction. In considering the question of whether the picketing was for a lawful purpose and was conducted peacefully, it must be noted that the Tallman Company did not have any dispute with its employees. The Tallman Company at all times was willing to bargain with any representative selected by its employees. None of its employees was a member of defendants' Local 688. After the picket lines were established, the Tallman Company attempted to have an election under the supervision of the N.L.R.B. but Local 688 disclaimed any interest therein.

Picketing by a non-representative union may be lawful or unlawful depending upon the purpose and intent of the picketing and the manner in which it is conducted. In this case, it was conclusively established that the purpose of the picketing was unlawful. It was in violation of the rights of the Tallman employees "to bargain collectively through representatives of their own choosing." Article I, Section 29, Constitution of Missouri 1945, and Title 29, Sections 157 and 158 of the Labor Management Relations Act of 1947. Defendants' purpose in picketing the Tallman Company place of business was to force plaintiff to sign a collective bargaining agreement and to force plaintiff's employees to join Local 688. Defendants do not contend otherwise. In oral argument in this court and in their brief, they take the position that such picketing is lawful. Note what was said in the brief: "The Court did not err in finding for defendants, because even if the avowed purpose of the picketing had been to force plaintiff to sign a collective bargaining agreement agreeing to hire only members of Local 688, that purpose would not have been unlawful, though as a result plaintiff's employees would have been forced to join the union or lose their jobs, Art. I, Section 29, Const. Mo. 1945, not applying."

Some of the evidence on this point and on the manner of conducting the picketing was reviewed in Judge Leedy's opinion, a portion of which we set forth: "While here there had been no direct demand by the union upon the employer for a contract, there was credible evidence that one of plaintiff's foremen was approached by a man who represented himself to be a business agent of Local 688 in which the purported agent inquired, 'Why don't you people sign up?' The foreman replied that none had ever approached 'us' to join, to which the agent replied, '*You might as well sign up because when all these other contracts are signed there still will be pickets in front of your place.*'

"It was also shown by a salesman for the company that the captain of the picket line asked if the salesman 'would talk to Mr. Tallman or Mr. Thompson (President) as to whether we would join the union,

*and they would offer us the same contract as'* a **[551]** *certain other* (previously non-union) *house got.*

"Moreover, counsel for defendants stated at the trial: 'We will certainly stipulate that these organizational picket lines are put up and are existing now and that as far as the union is concerned *they will not come down until* such time as *the employees join the union and they get recognition.* * * * We are willing to go a step further and say to the Court and will so stipulate that in putting up these organizational picket lines it is our hope that everyone that encounters that line will refuse to cross it. It is our hope that every concern that has previously done business with the company picketed will terminate its business relations with that company and discontinue all relations until the picketing itself is discontinued. We hope the customer, the suppliers of the plaintiff, will have nothing to do with them and we hope that the public opinion will become so strong as to persuade the employees to our way of thinking.'

"In addition to this, the following testimony of the Executive Secretary of Local 688 (who did not know the wage scale and working conditions at the plaintiff company) is highly revealing:

" 'Q. If the Tallman Company would right now agree to sign a contract with Local 688 what would you say? A. As of right now? * * * I would say I didn't want it, we couldn't sign it. * * *

" 'Q. Why not? A. Because we don't represent a majority of the members, the employees. * * *

" 'Q. Now, how long do you propose to maintain this picket line? A. I propose to maintain it until such time as the weight of public opinion can result in the employees joining the union and the company signing an agreement with us. * * *

" 'Q. How will the pressure of public opinion affect the employee? A. If they saw, for instance, that the public was taking their business to a firm which employs workers and pays decent wages and has decent conditions, it is possible the employees might recognize there must be something worth while about such a situation and they will come down and investigate the Union and sign up. * * *

" 'Q. Do you believe the Tallman Company employees are capable of determining their own best interests? A. Not necessarily, when sources of information are controlled, when people have certain economic pressures to put on you, you are no longer a free agent.

" 'Q. You believe you can better determine their interests than they can? A. I don't know as how I can necessarily, but a person outside of the pressures which work on the employee at Tallman's, who can be objective about evaluating the situation, who has background experience, has seen this happen thousands of times, can often be a better judge as to what is better for the person than the individual.'

"In the light of the facts we have enumerated, we think the conclusion inescapable that the object of the picketing was not to pub-

licize the fact that the Tallman employees were not members of the picketing union, but on the other hand was designed to so adversely affect plaintiff's business (and correspondingly, the ability of the employees to remain employed there) that the company would feel impelled to intervene in an effort to have the employees join the union, and obtain a contract.''

The evidence also disclosed that the pickets on duty at the Tallman place were actively engaged in ''baiting'' for trouble. Customers coming to the place were accosted by the pickets and intimidated and threatened. One customer was told he would find the road home pretty rough. When the customer replied the roads were not rough, the picket replied, ''I'm telling you the facts, Mister, it will be mighty rough.'' Another customer was told by a picket, ''If you go back in any more you will get hurt.'' These customers did not return. One of the employees, as she returned from lunch, heard one of the pickets say, ''Throw a God-damned bomb in the place. That will bring them to terms.'' [552] It was the practice of the pickets to follow any cars or trucks leaving plaintiff's place of business and to harass them along the highway or streets. This became very annoying and the police were called on for protection. It was admitted by the defendants that after the police stopped a few cars of the pickets following customers, they adopted the practice of having two cars follow so that when the police stopped one, the other would take his place.

Robert Kahtz, a salesman for Tallman, testified that on one occasion when he left the Tallman Company to go to his home in Cape Girardeau, he was followed by two cars being driven by Haley and Pollard, two of the pickets. Kahtz stated that in the 4100 block on Kingshighway in St. Louis, one of the pickets, having driven his car ahead of Kahtz, stopped his car, and the other picket driving a car following put his bumper against the Kahtz car and tried to shove it into the car ahead. Kahtz testified that he was followed by Pollard who, on the highway south, tried on several occasions to force Kahtz off the road; that this harassment continued until he reached Festus. It may be noted that Pollard testified that he followed more cars and trucks leaving Tallman than any other picket because his car could travel faster than any of the other cars.

Other incidents are in the record of the pickets' using obscene language and making threats toward customers and employees of the Tallman Company. We do not deem it necessary to relate further examples since those we have related are indicative of the general conduct of the members of the picketing force.

Picketing to coerce employees to join a certain union and to designate that union as a bargaining agent is a violation of our state constitutional provisions, supra, and Sections 157 and 158, Labor Management Relations Act of 1947; Katz Drug Co. v. Kavner, Mo.,

249 S.W. (2d) 166, l.c. 169, 170 (4-6) (7-9), and cases there cited. In the opinion adopted in Division II, Judge Leedy interpreted the meaning of Article I, Section 29, of our Constitution in these words: "The right of choice thus guaranteed employes means a free choice, uncoerced by management, union, or any other group or organization, so that picketing with an objective in violation of that guaranty must be regarded as equally unlawful as where coercion to violate a statute is involved, as in the Giboney case." Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 93 L.Ed. 834, 69 S.Ct. 684; Pappas v. Stacey, 116 A. (2d) 497.

As we interpret the cases of Garner v. Teamsters, 346 U.S. 485, 74 S. Ct. 161, 98 L. Ed. 228, and Weber v. Anheuser-Busch, Inc., supra, state courts would not have jurisdiction of this case if the picketing had been peaceful and orderly even though unlawful as violative of our state constitution and the provisions of the Labor Management Relations Act. It was held that in such situations the jurisdiction vests exclusively in the Federal agencies. We so held in Cooper Transport Co. v. Stufflebeam, 365 Mo. 250, 280 S.W. (2d) 832. However, in this case, the picketing was not peaceful and orderly. The harassment of customers and the salesmen of the Tallman Company by the pickets as shown by the evidence was such that a state court would have jurisdiction to enjoin. As we understand the Weber v. Anheuser-Busch, Inc., and United Construction Workers v. Laburnum Construction Corp. cases, supra, the Supreme Court of the United States held that state courts do have jurisdiction to enjoin threats of bodily injury and property damage to employees. In the Weber case, the U. S. Supreme Court, at page 485 of 75 S. Ct., had the following to say: "In Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U. S. 740, 62 S. Ct. 820, 86 L. Ed. 1154, the State was allowed to enjoin mass picketing, threats of bodily injury and property damage to employees, obstruction of streets and public roads, the blocking of entrance to and egress from a factory, and the picketing of employees' homes. The Court held that such conduct [553] was not subject to regulation by the federal board, either by prohibition or by protection."

In the case of United Construction Workers v. Laburnum, supra, the U. S. Supreme Court held that an employer may maintain a tort action against a union in a state court to recover damages inflicted by tortious conduct on part of pickets maintained by the union. Note what the court said, at page 840, Syl.(4), 74 S. Ct.: "If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive administrative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done. If petitioners were unorganized private persons, conducting themselves as petitioners did here, Virginia would have had undoubted jurisdiction of this action against them.

The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion.

"The jurisdiction of the Supreme Court of Appeals of Virginia is, therefore, sustained and its judgment affirmed."

We hold that the state trial court in this case was not without jurisdiction to grant plaintiff relief by injunction against the tortious conduct alleged in its petition and supported by substantial evidence. We hold further that having jurisdiction, the trial court was not justified in dismissing plaintiff's petition after the picketing ceased but should have held a hearing on the question of damages.

The case is therefore reversed and remanded to the trial court with directions to determine the question of damages. The costs to date are hereby taxed against defendants. The costs that may accrue on the hearing of damages are to be taxed against the losing party. It is so ordered. All concur.