UNITED BRICK & TILE DIVISION OF AMERICAN–MARIETTA COMPANY, Respondent,

v.

Willard WILKINSON, Nelson Price, Denver Whitt, and L. P. Williamson, Individually and as Representatives of Laborers Local No. 663, AFL–CIO; and O. C. Andrews, C. G. Hamilton, and Elmer Garzee, Individually and as Representatives of Hoisting Engineers Local No. 101, AFL–CIO; and John Doe and Richard Roe, Individually and as Representatives of Laborers Local No. 663, and Hoisting Engineers Local No. 101, Appellants.

No. 22871.

Kansas City Court of Appeals. Missouri.

May 4, 1959.

Robert S. Fousek, John J. Manning, Kansas City, for appellants.

Warren E. Slagle, Harry L. Browne, Kansas City, for respondent.

MAUGHMER, Commissioner.

Appellants here were named as defendants individually and as representatives of Laborers Local No. 663 AFL–CIO and Hoisting Engineers Local No. 101 AFL–CIO. We shall refer to these defendants as Unions. Respondent and plaintiff, United Brick & Tile Division of American-Marietta Company, is a producer, processor and distributor of brick and tile. Its home office is located in Chicago, but it operates plants at Harrisonville and at Raytown, Missouri. Both of these plants are involved in this litigation. The appeal, originally taken to the Supreme Court, was transferred to this court by mandate. Those interested in whether the jurisdiction in such case lies in the Supreme Court or in a Court of Appeals are referred to the Supreme Court opinion in Swift & Company v. Doe, 311 S.W.2d 15, under which a similar case was transferred to the St. Louis Court of Appeals.

It was stipulated that the company was engaged in interstate commerce as defined in the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and that it meets the jurisdictional standard of the National Labor Relations Board. At all times the company had an existing labor agreement with District No. 50 United Mine Workers covering its Harrisonville plant. In December, 1956, as a result of a "card check" by a neutral person it developed that District No. 50 was authorized as bargaining agent by 26 out of 37 employees at the Vale or Raytown plant. District No. 50 was thereafter so recognized by the company at the Vale plant.

On November 19, 1956, defendant Unions began to picket this Vale plant with a sign reading: "We urge laborers and engineers employed by United Brick & Tile Company to join us in our efforts to maintain union wages, hours and working conditions". On December 11, 1956, this picketing was extended to the Harrisonville plant. All of the company employees at both plants continued to work during the picketing. A large part of the company products were normally transported and delivered to customers by Brick Truck & Service Company, a contract carrier. Willard Wilkinson, president and business representative of Local 663, testified that the picketing jointly carried on by the two unions was "an organizational campaign", and that he notified Brick Truck & Service Company of the picketing. The managers of the company plants stated that the trucking company drivers refused to cross the picket lines and haul the products. They stated that the picketing and attending circumstances, including refusal of the carrier to transport their products, resulted in delayed deliveries on construction projects already under way, loss of orders for future business and a decrease in volume of the company business from $36,500 in December, 1955, to $11,800 in December, 1956. The parties stipulated that the Unions sought and on February 19, 1957, the National Labor Relations Board conducted a representation election at the Vale plant, the vote being seven votes for the petitioning union and twenty-five votes against it. The Board assumed no further jurisdiction in this matter. The company never sought to invoke the jurisdiction of the National Labor Relations Board.

On December 28, 1956, the company filed its petition, praying: (1) For an injunction restraining the unions from picketing either plant, and (2) for judgment against the defendant Unions in the sum of $50,000 actual damages, $50,000 punitive damages, and $500 per day from the date of the filing of the petition. On January 11, 1957, after hearing testimony, the Circuit

Court issued its temporary injunction, restraining picketing of both plants. On February 9, 1957, the Unions filed a petition in the Supreme Court of Missouri for a writ of prohibition on the ground that the Circuit Court was without jurisdiction of the subject matter. This petition for writ of prohibition was denied.

■ Thereafter on April 11, 1957, the parties filed a written stipulation signed by counsel, which provided that the evidence heard on the application for temporary injunction should be considered by the court as evidence in the hearing for a permanent injunction. The stipulation concluded with the following paragraph: "2. The claim of the plaintiff for damages, both actual and punitive, shall be held in abeyance to be tried and determined following the final determination of the prayer for a permanent injunction. All parties may offer such additional competent and relevant evidence as desired on the trial of the claim for damages". Immediately thereafter and on the same day the temporary injunction, restraining the picketing, was made permanent. Under the authority and action of our Supreme Court in Graybar Electric Co. v. Automotive, Petroleum & Allied Industries Emp. Union, 365 Mo. 753, 287 S.W. 2d 794, 797, we are authorized to decide the appeal as to the injunction even though the issue as to damages has not been determined.

Although the appellant Unions list three points of error, all three are substantially one and the same. It is their contention that the state court is without jurisdiction to grant injunctive relief because: (1) The practices involved herein and prohibited by the injunction are labor practices governed by the National Labor Relations Act, and the National Labor Relations Board has exclusive jurisdiction thereof. (2) Congress has pre-empted the field and delegated exclusive jurisdiction to the National Labor Relations Board, and (3) Peaceful picketing by a union which represents a minority of employees is a labor practice regulated by the Act and Board, and there-

fore a state court is without jurisdiction to enjoin.

We have here a comparatively small business, both as to number of employees and volume of business. It is engaged in interstate commerce. Its employees by vote selected a rival rather than appellant unions as their bargaining representative. The workers wanted to and did continue to work. Appellant Unions' pickets—strangers—although wearing placards proclaiming a purpose "To maintain union wages, hours and working conditions" were, as their business representative stated, engaged in "An organizational campaign". It is a fair statement, we think, to say that their purpose was to force and coerce both employer and employees to accept their unions. Their campaign and the picketing were ineffective directly upon either the workers or the company, but the Unions notified Brick Truck & Service Company, carrier of respondent's products as to their campaign and as to the picketing. The carrier refused to cross the picket line, the company's products accumulated undelivered, its business shrunk and its profits vanished.

May such picketing be restrained by a state court? In Missouri, picketing for such purposes has many times been held to violate the free choice guaranteed to employees by Section 29, Article I, Constitution of Missouri, 1945, V.A.M.S.; Quinn v. Buchanan, Mo., 298 S.W.2d 413; Bellerive Country Club v. McVey, 365 Mo. 477, 284 S.W.2d 492; Tallman Company v. Latal, 365 Mo. 552, 284 S.W.2d 547. Appellant Unions insist that Congress has pre-empted the field and delegated exclusive jurisdiction to the National Labor Relations Board, thus leaving to the state courts only authority, under police power, to restrain violence. Rather reluctantly and in conformity with decisions of the highest court of the land we agree generally with appellants' position.

In Garner v. Teamsters, Chauffeurs and Helpers Local Union No. 776 (A.F.L.) 346 U.S. 485, 74 S.Ct. 161, 163, 98 L.Ed. 228,

petitioners were engaged in the trucking business. Four of its 24 employees were members of respondent Union. No controversy, labor dispute or strike was in progress. Respondents placed stranger pickets at petitioner's loading platform. They carried signs, asking the employees to join "to gain union wages, hours and working conditions". The picketing was peaceful but drivers for other carriers refused to cross the picket lines and petitioner's business fell off as much as 95 percent. Respondents' conduct was in violation of the Pennsylvania Labor Relations Act. 43 P. S. § 211.1 et seq. The Supreme Court of the United States held that "The grievance was not subject to litigation in the tribunals of the State". In arriving at such ultimate conclusion the court held that Congress had pre-empted the field and vested jurisdiction in the National Labor Relations Board, saying:

> "Congress has taken in hand this particular type of controversy where it affects interstate commerce. * * *

> "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. * * *".

This decision specifically ruled (74 S.Ct. loc. cit. 164) " * * * that petitioners' grievance fell within the jurisdiction of the National Labor Relations Board to prevent unfair labor practices". These conclusions result from construction of the National Labor Relations Act, 49 Stat. 449, as amended, 61 Stat. 136, 29 U.S.C. § 151 et seq.; 29 U.S.C.A. § 151 et seq.

In Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 599, 1 L.Ed.2d 601, the Supreme Court said: "Since it was first enacted in 1935, the National Labor Relations Act has empowered the National Labor Relations Board 'to prevent any person from engaging in any unfair labor practice * * * (defined by the Act) affecting commerce.' By this language and by the definition of 'affecting commerce' elsewhere in the Act, Congress meant to reach to the full extent of its power under the Commerce Clause". In Guss, the Board, although clearly vested with jurisdiction, declined to accept for the reason " * * * the operations of the Company involved are predominantly local in character, and it does not appear that it would effectuate the policies of the Act to exercise jurisdiction". The opinion then recognizes that under the jurisdiction standards as promulgated by the Board in 1954, many labor disputes of small businesses are so small and local in character as to not effectuate the policies of the Act to hear them. It then declares that (1) Exclusive primary jurisdiction is with the Board; (2) Congress has pre-empted the field and the states are without even concurrent jurisdiction, and (3) That even though many labor disputes involving small businesses outside the jurisdictional standards of the Board, are thus left in a "twilight zone" where neither Board nor court may or will act on the controversy, nevertheless, the matter rests with Congress and "Congress is free to change the situation at will". What legislation, if any, should be or shall be enacted respecting these "twilight zone" cases is one of the hotly contested issues in the currently proposed labor law revisions now

before Congress. Our own Missouri Supreme Court in Graybar Electric Co. v. Automotive Petroleum & Allied Industries Emp. Union, 365 Mo. 753, 287 S.W.2d 794, considered these questions and reviewed the authorities. The court there ruled (Syllabus): " * * * that where employer filed unfair labor practice charges against local union and officials with Fourteenth Region of National Labor Relations Board charging unfair labor practices because union by picketing was allegedly attempting to force employer to compel its employees to join union, and Regional Director after investigation refused to issue a complaint, and, on appeal, General Counsel for Board sustained Regional Director's ruling, Circuit Court had no jurisdiction of employer's suit against the Union and officials to enjoin picketing, whether action by Board be deemed a disposition of the case on the merits or not".

On page 801 of 287 S.W.2d of the opinion the phrase "primary jurisdiction" as delegated to the Board was construed under the Garner and Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546, decisions to be not only primary but exclusive so that "not even the Federal Courts" can act until the National Labor Relations Board has considered the grievance except to issue temporary injunctions and then only after application by the Board, and that such is the situation even if the Board does not act.

Less than one year ago the St. Louis Court of Appeals reviewed a similar question in Swift & Company v. Doe, 315 S.W. 2d 465. In that case the circuit court granted an injunction against stranger picketing. There it was charged that the picketing was for the purpose of compelling and coercing the company salesmen to join respondent union. The Board refused to act. It was held the field had been preempted, primary and exclusive jurisdiction rested with the Board and the state court had no jurisdiction to issue an injunction.

Apparently Congress, in its wisdom and in the exercise of its legislative power, after viewing the variances and diversities existing as to substantive laws, procedures and precedents in the field of labor controversies, determined that public welfare required some uniformity in the field, such as Congress alone could establish. Likewise it believed that labor laws defining fair practices and unfair practices would not alone result in the desired similarity of adjudication in labor disputes. Different judges, federal and state, would interpret such laws, apply them to a variety of facts in numerous contests and certainly reach varying results. The courts, especially the federal courts, would be burdened with a mass of litigation. To submerge these hazards and because labor-management relations has become a specialized field, and since the public at large is directly affected by industrial wars, Congress established an administrative board, theoretically at least, made up of experts and vested primary jurdisdiction with such Board.

■ The Supreme Court of the United States has expressed the view that Congress would not have set up such an expert and expensive administrative labor agency to hear and determine just a few of the labor disputes. Rather Congress pre-empted the field and covered all such disputes where interstate commerce was involved and left with certainty to state courts only the power to act under the police power in the maintenance of law and order. It is not clear just what other powers, if any, or the extent thereof, remains with the state courts although the subject was discussed by the high court in two opinions. In the Garner case (74 S. Ct. at page 164) Mr. Justice Jackson said: "The National Labor Management Relations Act, as we have before pointed out, leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indications of congressional will the area in which state action is still permissible".

In the Weber case (75 S.Ct. at page 488) Mr. Justice Frankfurter made this state-

ment: " * * * the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy judicial exclusion of state action. Such was the situation in Garner v. Teamsters [etc.] Union, supra. But as the opinion in that case recalled, the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U.S. at page 488, 74 S.Ct. at page 164. This penumbral area can be rendered progressively clear only by the course of litigation". So far, except for restraint of violence, the federal decisions have failed to clear this penumbral area in which state injunction power is said to exist. In case after case, approval of state court authority to restrain has been refused.

In our particular case it should be noted the parties stipulated that the company and its business "meets the jurisdictional standard of the National Labor Relations Board". If this be true, then it seems the company should consider seeking relief directly from the Board.

On April 20, 1959, in San Diego Building Trades Council, etc. v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, the Supreme Court of the United States again reviewed these problems. The Unions sought from respondents an agreement to retain only those workers who were already members of the Union or applied for membership within 30 days. Respondents refused, claiming none of their employees had shown a desire to join the Union and that they could not accept until one of the Unions had been designated by the employees as bargaining agent. A California court granted an injunction and the California Supreme Court affirmed, 45 Cal. 2d 657, 291 P.2d 1. On appeal, the Supreme Court of the United States reversed, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (Decided with Guss v. Utah Labor Relations Board, 353 U.S. 1, 77 S.Ct. 598, 1 L. Ed.2d 601). The California courts then

awarded damages, 49 Cal.2d 595, 320 P.2d 473. On appeal the opinion by Mr. Justice Frankfurter reviews prior decisions and holds:

(1) State courts may enjoin and grant compensation for conduct marked by violence and imminent threat to the public order.

(2) State courts may neither enjoin nor grant compensation if the conduct is either prohibited or protected by the Act. (a) This is so even though the Board refuses to accept jurisdiction; (b) This is so if the conduct is "fairly debatable" as either protected or prohibited.

(3) The majority opinion holds or at least strongly intimates (and four justices so construed it) that state courts are powerless to act even though the activities are "neither protected nor prohibited". [359 U.S. 236, 79 S.Ct. 784.] Four justices joined in the above holding by the majority. Mr. Justice Harlan, joined by three justices, concurred in the result but dissented as to the reasoning and "the court's intimation" as to holding No. 3.

Respondent invites our attention to some state decisions: to Adams Dairy, Inc. v. Burke, Mo., 293 S.W.2d 281; to Pleasant Valley Packing Co. v. Talarico, 5 N.Y.2d 40, 152 N.E.2d 505, 177 N.Y.S.2d 473, 478, and to others. In the first case granting of an injunction was approved under a Missouri statute against an unlawful conspiracy in restraint of trade (Sec. 416.010, V.A. M.S.). In that case a widespread campaign to persuade the public to cease purchasing petitioner's products was being carried on. In the New York opinion, the majority declaring: "We do not think we should be quick to announce a lack of State jurisdiction in this general area", approved an injunction.

█ No matter how persuasively we might regard the New York and other state decisions, as to both reasoning and result, such opinions cannot divert us from the course charted in numerous decisions by

the United States Supreme Court. This is especially so when our own Supreme Court (Graybar) has reviewed the federal holdings and interpreted them as contra to petitioners' contentions. We believe that under our facts and under the decisions cited, the state courts are without jurisdiction.

Accordingly, the order of the circuit court granting a permanent injunction is reversed and the cause is remanded with directions to dissolve the injunction.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion by MAUGHMER, C., is adopted as the opinion of the Court. All concur.