Arthur C. BAUE and David Baue, Appellants,

v.

EMBALMERS FEDERAL LABOR UNION NO. 21301 AFL–CIO, an unincorporated labor organization, et al., Respondents.

No. 49789.

Supreme Court of Missouri,

En Banc.

March 9, 1964.

HYDE, Judge.

This case, first heard in Division No. One, was transferred to Banc without an opinion being adopted. However, an opinion prepared in Division stated the following facts which we adopt in substance without quotation marks.

Arthur C. and David Baue, as copartners, sued to enjoin the picketing of their funeral home in St. Charles by Embalmers Federal Labor Union No. 21301 AFL–CIO, an unincorporated labor organization, and certain named members thereof as fairly and adequately representing the class consisting of that union's membership.

After a preliminary hearing, the trial chancellor denied the Baues a temporary order enjoining the picketing and, after a change of judge and a further hearing for a permanent order, the new trial chancellor again denied the injunctive relief sought. The Baues have appealed from the ensuing judgment.

It is not contended that interstate commerce is sufficiently involved or affected by appellants' business to deprive the courts of this state of jurisdiction of the dispute; and inasmuch as the appellants have preserved points involving the construction of specified portions of the Constitutions of the United States and the State of Missouri, this court has jurisdiction of the appeal.

John Clay Smith, then a resident of Arkansas, was employed for an indefinite term as a licensed embalmer on January 3, 1961, by the Arthur C. Baue Funeral Home, a corporation (incorporated in 1952 or 1953), all of the stock of which was held by Arthur C. Baue, his wife, and his son, David. Smith continued in that employment until his discharge on April 20, 1962. The Baues claimed they had conducted their St. Charles funeral home as a partnership since March 28, 1962, although the corporation which formerly operated that business was never dissolved and in fact continued to operate a funeral home in a nearby town.

Robert V. Niedner, Niedner, Niedner & Moerschel, St. Charles, John R. Stockham, Stockham & Breckenridge, St. Louis, for appellants.

J. F. Souders, Gruenberg, Schobel & Souders, St. Louis, for respondents.

Henry Andrae, Jefferson City, Hendren & Andrae, Jefferson City, of counsel, for National Selected Morticians, a not for profit association, amicus curiae.

Edward D. Summers, Jefferson City, for Missouri Funeral Directors & Embalmers Ass'n, Inc., amicus curiae.

A few days after Smith's discharge the union began picketing their St. Charles establishment.

From time to time during the period of Smith's employment (approximately a year and four months), he and the Baues had discussed the matter of the possibility of his being interested in or joining an embalmers union and the Baues had indicated their firm opposition to such a move, making clear their view that if Smith joined the union he would be unable to continue in their employ because they, Arthur and David, were also licensed embalmers and did part of the embalming work at their St. Charles funeral home and a union contract would prohibit their continuing to do that work. During those conversations Smith indicated his lack of interest in joining a union and made certain statements clearly suggesting his opposition to union membership under the circumstances.

Nevertheless, during the first week of April 1962 (all dates hereinafter mentioned are in 1962), Smith contacted the union's president, Mr. Van Fossan, and indicated that he wanted that union to be his sole agent for collective bargaining with his employer. The union, whose total membership at trial time was eighty, agreed to try to help him. As a result, Van Fossan sent to Smith for signature an "authorization for representation" designating the union as his "sole and exclusive representative for the purposes of collective bargaining, to negotiate and execute an agreement on my behalf with my said employer covering my wages, hours and all other conditions of employment." Smith signed that paper on April 9 and returned it. On April 13 the attorney for the union directed a letter to "Arthur C. Baue Funeral Home, Inc." (received on April 14), advising of the fact that the union represented the embalmer employees of the corporation and demanding recognition of the union as bargaining agent for such employees and requesting a meeting on April 17 "for the purpose of negotiating a labor agreement for such unit." The meeting was held April 20.

Upon receipt of that letter the Baues, either Arthur or David or both, talked with Smith inquiring specifically whether, and Smith denied that, the union had talked with him or had contacted him in any way. Although Smith explained at the trial that he had contacted the union and that he was not asked whether he had, it is entirely clear that Smith did not disclose that he had designated the union as his bargaining representative, even though that information was reasonably called for by the questions asked by his employer. He explained, "I was afraid of being frank and candid because I was afraid of my job."

Smith further testified that on April 14, after they had received the letter from the union, the Baues again admonished him to have nothing to do with the union and suggested that they wanted to enter into a partnership agreement with him and one Ermeling so he would be part of management, and suggested further that he was to deny to anyone who inquired that he did any embalming; that on April 16 a partnership agreement was presented but Smith did not sign it saying he wanted to discuss it with his Arkansas atttorney; that Mr. Arthur Baue suggested that they might want Smith to leave town for a few days to avoid talking with union representatives and later that day told Smith to forget about the partnership agreement. On the 19th it was agreed that Smith could go home (to Arkansas) over Easter and Arthur suggested he stay there until they called him, but before leaving they wanted a letter of resignation back dated to April 7 so that his employers could show the union that he (Smith) was not an employee. Admittedly, Arthur Baue wrote such a letter on April 19, dated it twelve days prior thereto, i. e., April 7, and asked Smith to copy it and mail it or give it to them.

On April 19, the Baues also submitted to Smith a supplementary limited partnership agreement and stated that the suggested letter of resignation would not affect the partnership agreement and that in any event Smith would continue to receive his

salary. Arthur Baue testified that at the time they submitted the second limited partnership agreement they also furnished Smith with a copy of the partnership agreement which Arthur and David claimed to have executed on March 28, 1962; and Mr. Baue testified further that he intended to use the back-dated letter purporting to show Smith's resignation on the 7th in order to show the union that they did not have an embalmer employee. Smith did not sign the letter nor the partnership agreement. He took them with him to Arkansas but, in the meantime, informed Van Fossan of the proffered agreement and the suggested back-dated letter of resignation. Smith went to Arkansas on the 19th and, on the 20th, union representatives called on the Baues. The Baues demanded to know by what authority the union men were there, whereupon Van Fossan furnished a copy of the authorization which theretofore had been executed by Smith. The union representatives then presented the standard contract which it sought to have executed by the operators of funeral homes conducting in excess of 85 funerals a year (the Baues did 130 funerals in the preceding year), and that document was discussed. The Baues were familiar with it because a similar contract had been presented to them five years previously but had not been signed.

After some discussion, including the point that under the contract neither Arthur nor David could do embalming so long as they remained as owners, the Baues suggested they needed further time to consider the matter. The union acquiesced and it was specifically agreed that another meeting would be held at the funeral home on April 25 for further negotiations.

The following Monday, April 23, Smith returned to the funeral home where he was handed the following letter:

"Dear Mr. Smith:
"Since we have not received the letter of resignation from you, which you advised us on April 19, 1962 you would send

us on April 20, we wish to advise you that your employment by Arthur C. Baue and David C. Baue is considered terminated by us as of April 20, 1962.
Very truly yours,
s/ Arthur C. Baue
s/ David C. Baue"

Although the foregoing states unequivocally that the reason for the discharge was the fact that Smith had failed to send the back-dated letter of resignation, the Baues testified that the reason stated was not the sole cause for Smith's discharge; that another was that he had not been truthful and candid with them in that he had failed to disclose the facts but, on the contrary, had deceived them concerning his contacts with the union.

Smith informed Van Fossan of the letter of discharge, whereupon the union directed and its attorney wrote the following letter to Arthur C. Baue Funeral Home, dated April 24th:

"Local 21301, Embalmers Federal Labor Union, AFL-CIO protests your unfair action in discharging from your employment embalmer John Clay Smith.

"We ask that you set a time, date and place for a meeting to discuss settlement of this issue. Local 21301 intends to use the legal and economic measures available, including picketing, to obtain a remedy of the said unfair action."

On April 25 the union established a picket line at the funeral home consisting (at least shortly after its installation) of one picket at a time carrying a sign which said:

"NOTICE TO THE PUBLIC
ARTHUR C. BAUE FUNERAL HOME
UNFAIR TO EMBALMERS F. L.
UNION 21301
AFL-CIO"

There is no contention that the picketing has not been peaceful and there was no evidence of any misconduct on the part of any picket.

Mr. Van Fossan, the union's president, insisted at both hearings that the sole reason for the picketing was, as the letter stated, to protest the unfair discharge of Smith, who was fired while the union was in the process of attempting to negotiate a contract for him. Appellants adduced evidence indicating some adverse effect of the picketing upon their business, particularly by reason of what they perceived to be the opinion of the public with respect to a picket line at a funeral home. Other material facts will be hereinafter stated.

■ We have held in the suit brought by Smith, heard with this case by the trial court under an agreement that all the evidence would apply to both cases, (Smith v. Arthur C. Baue Funeral Home et al., Mo., 370 S.W.2d 249, 254) that the right of an employer to terminate, at any time and for any reason, an employment without definite term, was modified to this extent: "[A]n employer may not discharge an employee for asserting the constitutional right thereby given him to choose collective bargaining representatives to bargain for him concerning his employment." We further held: "[P]laintiff's discharge, if it was for that reason (and plaintiff had substantial evidence to show that it was), was a wrongful discharge for which he could maintain an action for damages." Defendants contend their picketing was solely to protest Smith's discharge and to exercise their right of free speech to inform the public about it, relying on the First and Fourteenth Amendment to the Constitution of the United States and Sec. 8, Art. I, of the Constitution of Missouri, V.A.M.S., citing such cases as Ex parte Hunn, 357 Mo. 256, 207 S.W.2d 468; Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; Bakery and Pastry Drivers and Helpers, I. B. T. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178. Under these decisions, picketing solely for this purpose would be lawful. However, plaintiffs claim the real purpose of the picketing was to obtain a labor contract which would

prevent them from doing embalming in their own establishment and require them to employ a member of defendants' union as an embalmer who would do no other work than embalming. Plaintiffs say "this contract would violate public policy in Missouri under the Constitution of the United States in its Fifth and Fourteenth Amendments, as depriving them of property without due process of law, and of the Constitution of Missouri, Article I, Sections 2 and 10, guaranteeing Appellants the right to the enjoyment of the gains of their own industry and providing that they be not deprived of property without due process of law, as construed in Hughes v. Kansas City Motion Picture [Mach.] Operators Union, 282 Mo. 304, 221 S.W. 95; Heath v. Motion Picture Machine Operators Union, [365] Mo. [934], 290 S.W.2d 152, and Kerkemeyer v. Midkiff, Mo., 299 S.W.2d 409." They point out that we have held that picketing which is for both lawful and unlawful purposes is unlawful, citing Wolferman, Inc. v. Root, 356 Mo. 976, 204 S.W.2d 733, 735, 174 A.L.R. 585; Kincaid-Webber Motor Co. v. Quinn, 362 Mo. 375, 241 S.W.2d 886; Katz Drug Co. v. Kavner, Mo.Sup., 249 S.W.2d 166, (see also A.L.I. Restatement of Torts, Sec. 796); citing also on the proposition that the State may determine and enforce its own public policy, in intrastate commerce, as to what is unlawful picketing, International Brotherhood of Teamsters et al. v. Hanke et al., 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995, 13 A.L.R.2d 631; International Brotherhood of Teamsters et al. v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347; Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Giboney v. Empire Storage and Ice Company, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Hughes v. Superior Court of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985; Bellerive Country Club v. McVey, 365 Mo. 477, 284 S.W.2d 492; Tallman Company v. Latal, 365 Mo. 552, 284 S.W.2d 547. The facts of this case are that the picketing followed a demand that plaintiffs execute a contract with the union which would prohibit them from doing any em-

balming in the operation of their business in which they had been doing most of it. Smith was not a member of the union and apparently would become a member only if plaintiffs made this contract with the union.

Defendants, in making their demands, relied on Pfitzinger Mortuary v. Dill, Mo. Sup., 319 S.W.2d 575. However, the plaintiff in that case was a corporation which had for some time employed a union embalmer under a contract which allowed the owner of a majority of stock to embalm but which the union would not renew. While it appeared Mr. Pfitzinger owned 75% of the stock, the ownership of the rest was not shown nor was it shown how much embalming he did nor what financial effect such a contract would have on his business. Here plaintiffs, operating as a partnership, had substantial evidence that the effect of preventing them from doing any embalming would so increase their costs as to cause great loss of business, cause them to give up their ambulance service, and price them out of competition with the two other funeral homes in the city, each of which had less than 85 funerals annually and were not being asked to sign a contract with the union. David Baue said owner's work "includes everything that is done around a funeral home, all the way from sweeping the front walk to directing a funeral and embalming bodies and taking them to the cemetery * * * partly handling the books * * * dealing with customers * * handling public relations." He said low cost ambulance service was important in public relations.

Our view from all the evidence is that the demand for a contract preventing plaintiffs from doing any embalming in their own establishment cannot be separated from the purpose of the picketing. The union president testified that this provision was not negotiable and that the purpose of the visit was to obtain such a contract with plaintiffs. At the first hearing he answered "yes" to the inquiry that "the only thing that stopped your attempt to get the Baues

to sign this contract was the fact that they discharged Smith?" He also testified: "Q If the Baues would reemploy Mr. Smith, your Union would seek to have them sign such a contract, wouldn't you? A Yes; the contract is universal." At the trial, he further testified: "Q Mr. Van Fossan, are you prepared to say here and now that if the matter of Smith's employment—or re-employment, without a contract with your Union, could be worked out to his satisfaction, that you would be willing to continue to negotiate indefinitely with the Baues and never call a strike because they wouldn't sign a contract with that provision in it? A I wouldn't say. Q You wouldn't say that in a million years? A I would not say it, no. I have a Board to answer to, also." Thus it appears that the union purpose was and continued to be to obtain a contract requiring plaintiffs personally to stop embalming and to employ union embalmers exclusively for embalming and that the discharge of Smith only was the occasion for the picketing and not the sole reason for it. Any other view seems completely unrealistic in the light of all the evidence. We consider this purpose to be in conflict with the policy of this state as stated in the Hughes, Heath and Kerkemeyer cases. As stated in the latter case (299 S.W.2d 1. c. 415), "We can conceive of no surer way of eliminating the small independent business man from the economic scene than to compel him to stop working with his own hands in his own business." It is against the policy of this state to do that.

However, defendants contend plaintiffs are not entitled to equitable relief because they have not come into equity with clean hands. Defendants base this on the discharge of Smith which they claim was a wrongful act, done because he exercised his constitutional right to make the union his bargaining agent. They further say: "Attempts were made by plaintiffs to secure a fraudulent 'resignation' letter from Smith for the purpose of deceiving the defendant

union of the true state of facts. Plaintiffs further concealed from the defendant union the status of the corporation until after this litigation commenced." As to the reason for Smith's discharge, we said in his case that this was a jury issue (370 S.W.2d l. c. 254) to be decided on retrial. If it is found to be wrongful he will have a remedy in damages so we will not make any final determination of that issue here. Plaintiffs' conduct in seeking a back-dated resignation from Smith, done for deception as to the true situation, of course was most improper but there was no attempt to make such deception the basis of their suit as in Saito v. Waiters and Waitresses Union, 4 LRRM 837. Other cases cited by defendants, Sitkin v. International Fur Workers Union, Local 87, 5 LRRM 963, and Devon Knitwear Co., Inc. v. Levinson, 173 Misc. 779, 19 N.Y.S.2d 102, denied relief because of refusal to bargain collectively by plaintiffs under legal obligation to do so. Nevertheless defendants' knowledge of this attempt to deceive made them not unreasonably suspicious of other statements of plaintiffs and their claim to be a partnership. Thus it had some effect in bringing about picketing.

It was stated in the oral argument before the Court en Banc that there probably would not have been any picketing if defendants then had known the business was a partnership. However, Smith had talked to the union president about the partnership agreement offered him by plaintiffs and had been told by him that "if he became a partner then that would eliminate him from becoming a union embalmer." Moreover, when Smith returned from Arkansas on Monday, April 22, he gave the union president the partnership agreement he had taken with him, all of this being some notice of a partnership. Furthermore, on May 4, at the beginning of the hearing for a temporary injunction, the union's attorneys representing Smith amended his answer to state that "Arthur C. Baue and David Baue comprise a co-partnership engaged in the business of operating a funeral business under the name of Arthur C. Baue Funeral Home at 620 Jefferson Street, St. Charles, Missouri" and made them both parties. This status was admitted in plaintiffs' pleadings in that case and stated in their petition in this case; and the court found at the trial, in June, that "Arthur C. Baue and David Baue are co-partners engaged since on or about March 28, 1962, in the operation of a funeral establishment under the name of Arthur C. Baue Funeral Home in the City of St. Charles." However, even after acknowledgment and determination of this status of the business, the union continued its picketing.

■ The clean hands maxim "must still be taken with reasonable limitations," Pomeroy's Equity Jurisprudence, 5th Ed., Sec. 399, see discussion in Secs. 400–404; see also 19 Am.Jur. 323–332, Equity Secs. 469–479; 30 C.J.S. Equity §§ 93–99, pp. 475–498. As stated, 30 C.J.S. Equity § 95, p. 488: "[E]quity will consider the conduct of the adversary, the requirements of public policy, and the relation of the misconduct to the subject matter of the suit and to defendant." Because of plaintiffs' conduct, hereinabove discussed, we consider the court properly denied the temporary injunction sought, and our view is that in this proceeding plaintiffs should be denied damages claimed to have been caused by the picketing. Nevertheless, when the status of plaintiffs as a partnership was settled by the court, which is not now contested, our view is that an unlawful purpose for the picketing was obvious and should be declared. Therefore, we will treat plaintiffs' petition as one for declaratory judgment, sufficient facts being stated for that purpose, and leave to the trial court the determination of whether injunctive relief is now required.

The judgment is reversed and remanded with directions to enter judgment declaring that defendants' picketing was for an unlawful purpose and to grant injunctive relief if the picketing involved is continued.

All concur.