CITY OF WEBSTER GROVES, Missouri,
a Municipal Corporation,
Plaintiff-Respondent,

v.

INSTITUTIONAL AND PUBLIC
EMPLOYEES UNION, etc.,
Defendants-Appellants.

No. 36689.

Missouri Court of Appeals,
St. Louis District,
Division One.

April 22, 1975.

Motion for Rehearing to Amend Opinion
Denied May 19, 1975.

Charles R. Oldham, St. Louis, for defendants-appellants.

George J. Bude, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, for plaintiff-respondent.

WEIER, Presiding Judge.

Plaintiff City of Webster Groves, a municipal corporation, filed suit to make permanent a temporary injunction restraining defendants, members of Institutional and Public Employees Union, AFSCME, Local 410, AFL–CIO, from picketing in designated areas of Webster Groves. Defendants filed a counterclaim for vacation pay allegedly owed to certain union members who were discharged employees of Webster Groves. The trial court granted a permanent injunction and denied relief on defendants' counterclaim. Defendants have appealed.

In September, 1972 the Secretary-Treasurer of defendant union sent a letter to Webster Groves officials requesting that Local 410 be recognized as the exclusive bargaining agent for an appropriate bargaining unit among the public works employees. After further correspondence between these parties, the Missouri State Board of Mediation was requested to conduct an election.

Prior to the events related above, in June, 1972, Webster Groves had begun a move to increase the salaries of some city employees. A Chicago firm was preparing a position classification and pay plan for Webster Groves. All city employees were notified at this time that such a study was being conducted and that some of them could expect to receive a salary increase, if warranted, later in the year. This study was completed in October, 1972 and submitted to Webster Groves officials. The matter was discussed at a November 21, 1972 meeting of the City Council. A plan for salary increases was to be implemented. Under this plan, wage increases would be granted to some

forty employees of Webster Groves, including sixteen members of the bargaining unit sought by Local 410.

The union election was scheduled for January 4, 1973. Plaintiff's City Manager called a meeting of the Public Works Department employees on January 3 and advised them of the election. He outlined the election procedure to be followed and read the state statutes covering the right of public employees to organize. He also discussed the recently-completed study which had been put into operation. Concerning the new system of personnel administration, he added that whether or not there was a union, salary increases would continue to be recommended by department heads and forwarded to him.

Also, on January 3, 1973, based on the study and the decision of the City Council to implement it, a number of employees in the Public Works Department were given a pay increase. Several defendants testified that they received notice of the pay increase from the Public Works Director, who informed them that they should remember the wage increase when they voted.

The union won the election by a vote of 28 to 9 and was certified as the collective bargaining agent by the State Board of Mediation. After the election and certification, negotiating teams representing both plaintiff and defendants met on a number of occasions to discuss wages, hours, and employment conditions for the Public Works Department employees. While no written agreement resulted from these negotiations, oral agreement was reached on a number of items.

However, on May 25, 1973, members of the union negotiating team charged that plaintiff had attempted to "break" the union. Defendants claimed that an employee had been discharged without cause. Webster Groves representatives disclaimed any efforts to "break" the union and stated that the discharge in question resulted from insubordination. City officials further took the position that the discharge in any case was not a proper subject for negotiation, and requested that the negotiations be continued. In response, the union representatives left and did not return for further negotiating sessions.

On June 26, a regular work day, seventeen full-time employees of the department failed to go to work and set up a picket line in front of the city service center (also called the city garage) and at the city hall. These employees, together with members of Local 410, carried signs alleging that the City of Webster Groves was "unfair to Local 410". This picket line halted construction of a wing to the city hall. A regular gasoline delivery to the city scheduled for the week of June 25 was not received until late Friday, June 29. The city service center (city garage) was the point at which all other materials for the Public Works Department were to be delivered. The City Manager informed the striking employees by letter of June 26 that they would be fired the following day if they did not return to work. The next day all employees continuing the strike were notified of their immediate discharge, with reasons stated.

A temporary restraining order halting the picketing was issued Friday, June 29, by the Circuit Court of St. Louis County. After issuance of the order, construction on the addition to city hall resumed and the gasoline deliveries were made to Webster Groves. The circuit court then issued a temporary injunction on July 24. After a trial on the merits, a permanent injunction, entered October 25, 1973, enjoined defendants from picketing the job site of the city hall addition, the city service center, any road construction work within Webster Groves, and from doing violence or threatening violence on any city official. However, the permanent injunction order specifically permitted informational picketing along the north side of the city hall.

On appeal, defendants initially invoke the doctrine of unclean hands and contend that plaintiff was not entitled to equitable relief. Defendants thereby claim that the trial court erred by granting the injunction. According to defendants, plaintiff committed illegal acts in an effort to "break" the union prior to the strike and to prevent the employees from exercising their rights to join and to form labor unions.[1] In support of this contention, defendants claim that plaintiff made threats against certain employees, that plaintiff intended to deprive employees of wage increases if they participated in the union, that plaintiff threatened to fire newly-hired employees if they joined the union, and that plaintiff promised wage increases to employees who refrained from union activity. Such allegations, if proven, could constitute unfair labor practices by a municipality, and public employees are entitled to relief against a governmental body committing unfair labor practices. See State ex rel. Missey v. City of Cabool, 441 S.W.2d 35 (Mo.1969).[2] Defendants introduced some testimony as to threats made by plaintiff City to employees concerning union activities and involvement. Defendants also claimed that the firing of Walter Lloyd, a union shop steward, constituted another unfair labor practice. However, plaintiff introduced testimony of its City Manager and Director of Public Works to refute and to explain testimony adduced by defendants. Even some former employees testified that no threats were made against them and that they knew of no such threats. Further, evidence was presented to the effect that Walter Lloyd's discharge resulted from insubordination and not union bias by plaintiff.

Defendants also contend that the unilateral wage increase effected by plaintiff immediately prior to the election, failure by plaintiff to accept the "good offices" of the State Board of Mediation in resolving the labor disputes, and the calling of a meeting by plaintiff officials to discuss the election with the employees, all were illegal and unfair labor practices. However, defendants have failed to demonstrate in what way such activities violated any provision of Chapter 105, RSMo 1969; nor have defendants cited any cases holding such actions by a governmental unit to be illegal. This was a court-tried case. Thus factual resolutions and issues of credibility were to be decided by the trial judge. To this determination, we normally defer. In our review of the record and the evidence we find no error in the judgment of the trial court. Rule 73.01(3), V.A.M.R. Defendants' contentions to the contrary are without merit.

Defendants next submit that the trial court erred by enjoining their informational picketing because a strike no longer existed against Webster Groves. They assert that since peaceful picketing is protected by both the United States and Missouri Constitutions, their constitutional rights have been abridged by the issuance of the injunction.[3]

Defendants agree that public employees have no right to strike under Missouri law.[4] But they claim that since they have been fired there no longer exists an

---

1. Chapter 105, RSMo 1969, V.A.M.S., guarantees public employees, with certain specific exceptions, the right to join labor unions.

2. In the Missey case, public employees charged and proved unfair labor practices in order to regain their jobs with the City of Cabool.

3. Defendants argue that "the First and Fourteenth Amendments of the Federal Constitution and Sections 8, 9, 10, 25 (sic), 29 and 31 (sic) of Article 1 of the Constitution of Missouri" protect their right to picket peacefully.

4. § 105.530 RSMo 1969, V.A.M.S. provides: "Nothing contained in sections 105.500 to 105.530 shall be construed as granting a right to employees covered in sections 105.-500 to 105.530 to strike."

employer-employee relationship between plaintiff City and defendants. They point out that plaintiff has no plans to rehire them, that they are not considered employees, and therefore they are not picketing as public employees in support of a strike. Thus defendants urge that they have the constitutional right to inform the public of the "unfair labor practices" of the City of Webster Groves, and that plaintiff has shown no high and compelling reason to deprive defendants of their constitutional guarantees.

■■ We of course agree with defendants' general contention that peaceful picketing is protected by both the federal and state constitutions. However, the right to picket, as is the case with many constitutional safeguards, is not absolute. While it is difficult here to separate defendants' original strike from the later picketing, their main contention in this case centers on their status after the discharges. As noted above, defendants claim that they can no longer be considered public employees. But nowhere do defendants define their status after the dismissals.

■■ Picketing by employees or union members is not protected by constitutional safeguards when the result or objective is against state law or policy. Baue v. Embalmers Federal Labor Union No. 21301 AFL–CIO, 376 S.W.2d 230, 234[2], 235[3, 4] (Mo. banc 1964). Actual or threatened wrongs to a governmental body constitute a sufficient reason to enjoin picketing and governmental functions may not be impeded or obstructed by strikes or picketing. City of Grandview v. Moore, 481 S.W.2d 555, 557–558[2, 3] (Mo.App.1972). After their discharges, whether defendants be considered public employees or private union members, their picketing could be enjoined if plaintiff's governmental functions were disrupted or impeded. Further, even assuming that defendants were merely private citizens after the discharges, they would have no right to picket anywhere they chose. Picketing by private citizens is not protected where such activities disrupt governmental functions, or cause problems to public health or safety.

Here, the evidence tended to show that plaintiff's governmental services and functions were disrupted by the picketing. The picket line halted construction of a wing to the city hall. A regular gasoline delivery to the city could not be made until the picketing had been halted. This gasoline was to be used for the operation of all city vehicles, including fire trucks and police cars. Likewise, the city service center was the point at which all other materials for the Public Works Department were to be delivered. The trial court could find from the evidence that the picketing was disruptive of governmental services and should have been enjoined. Further, the court's injunction did not prohibit all picketing by defendants. They were permitted to continue their picket line along Lockwood Avenue on the north side of the city hall. Thus, defendants were left in a position to exercise their right to picket peacefully. We find no error by the trial court in its issuance of the injunction.

Defendants further contend that the trial court erred by denying their counterclaim for vacation pay. They maintain that plaintiff had no authority to appropriate their vacation pay, since this constituted earned wages. Defendants urge that vacation pay is deferred compensation in lieu of wages earned, that it is payable at some later time, and as such it cannot be withheld from the employee upon voluntary or involuntary termination of employment.

Here, plaintiff had enacted personnel rules and regulations providing that regular city employees leaving the city's service could receive accrued vacation compensation only if they resigned in good standing. A particular procedure was to be followed

in order "[t]o resign in good standing."[5] But plaintiff's theory that the vacation pay abated under the provisions of the personnel rules and regulations fails in face of the fact that defendants did not resign but were discharged. The personnel director and city manager of the City of Webster Groves wrote each of the defendants on June 27, 1973, and notified each one he was "discharged from the service of the City of Webster Groves" effective that day.

■■■■ The right to vacation pay upon termination of the employer-employee relationship is a contractual right. It may be the subject of the provisions of a written contract. Brackett v. Easton Boot and Shoe Company, 388 S.W.2d 842, 847[2] (Mo. 1965); Birch v. Glasgow Savings Bank, 114 Mo.App. 711, 90 S.W. 746 (1905). Or it may be established by implied contract. State ex rel. H. K. Porter Company, Inc. v. Nangle, 405 S.W.2d 501 (Mo.App.1966); Vail v. Rumsey & Sikemeier Co., 137 Mo.App. 446, 119 S.W. 42[3] (1909). Customs and usages may by implication become part of the parties' contract. State ex rel. H. K. Porter Company, Inc. v. Nangle, supra, 405 S.W.2d at 503[7].

■■■■ In the case before us, the city manager, who also occupied the positions of director of finance and director of personnel for the City, acknowledged that the defendants as city employees had accrued vacation days at the time of their discharge. These days were accrued at the rate of five-sixths of a day for every month of service. According to the City records, the amounts of accrued vacation pay varied from as low as $35.82 for one defendant to as high as $505.56 for another. We see no reason why this vacation pay was not awarded to the defendants on their counterclaim.[6] Admittedly, there was some vacation pay due almost all of the defendants at the time of their discharge on June 27, 1973. Although they had improperly gone on strike June 26, 1973, they had previously earned their vacation pay under contract with the City as acknowledged by the city manager. They obviously had no intention of resigning when they went on strike. Their separation from their employment came when they were discharged by the City because they participated in an illegal strike. No provision of the city rules and regulations pointed out to this court would prevent them from receiving accrued vacation pay when they were discharged.

The judgment for plaintiff on plaintiff's petition is affirmed. The judgment for plaintiff on defendants' counterclaim is reversed and the cause remanded so that the trial court may determine the amount of vacation pay due each defendant, if any, and render judgment thereon in accordance with this decision. Costs are taxed against the plaintiff.

DOWD and RENDLEN, JJ., concur.

---

5. " * * * A regular employee leaving the city's service shall be compensated for vacation leave accrued to the date of separation only if he has complied with the provisions of Section 11.6 hereof." Section 10.4, Personnel Rules and Regulations of the City of Webster Groves.

"Section 11.6 Resignation: To resign in good standing an employee must give the appointing authority at least fourteen calendar days prior notice unless the appointing authority, because of extenuating circumstances, agrees to permit a shorter period of notice. A written resignation shall be supplied by the employee to the appointing authority giving reasons for leaving. * * "

6. See for example: Vangilder v. City of Jackson, 492 S.W.2d 15 (Mo.App.1973) wherein this court upheld the right of an ill employee to sick-leave pay accrued at the time his employment was terminated by a city; and Bruce v. City of St. Louis, 217 S.W.2d 744 (Mo.App.1949) wherein this court upheld the right of a city employee to accrued vacation pay after discharge even though he had been employed elsewhere.