Sylvia T. GOULD, Plaintiff,

v.

Wayne R. STARR, Jr., Executor, Defendant.

Mary Elizabeth GOULD, I. Lee Kraft, Guardian ad litem for Patricia Elizabeth Gould and Joan Ilene (Jane Eileen) Gould, James L. Gillham, Administrator, Defendants-Crossclaimants-Respondents,

v.

Wayne R. STARR, Jr., Christine L. Moreland, Elwyn Cady, Jr., Defendants-Appellants.

Nos. KCD 28846, 28849 and 28850.

Missouri Court of Appeals, Kansas City District.

Oct. 11, 1977.

Motion for Rehearing and/or Transfer Denied Oct. 31, 1977.

Application to Transfer Denied Dec. 19, 1977.

---

Thomas M. Sullivan, Eileen S. Sullivan, Downey, Sullivan & Fitzgerald, Kansas City, for appellant Starr.

John H. Foard, Jr., Foard & Foard, Kansas City, for appellant Moreland.

Elwyn L. Cady, Jr., Independence, for appellant Cady.

I. L. Kraft, Kansas City, James L. Gillham, Independence, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Petition for removal of trustees of testamentary trust, for accounting by trustees, for surcharge of trustees' accounts and for punitive damages. Trial court entered judgment removing trustees, surcharging their accounts and assessing punitive damages. Trustees have appealed.

Elmer A. "Doc" Gould, a Kansas City businessman and investor, died October 20, 1968. He was survived by his widow, Sylvia Gould, and three minor children, Mary Elizabeth, Patricia Elizabeth and Joan Ilene (Jane Eileen) Gould. Gould and his wife were estranged at the time of his death. Mrs. Gould had sued for separate maintenance and her husband counterclaimed for divorce, which were pending at his death. Doc Gould's attorney in the proceedings was Wayne R. Starr, Jr.

The will of Gould with three codicils was admitted to probate. The will, dated January 2, 1968, was, as were the codicils, drawn by Starr. The will left her place of residence and its contents to Sylvia. Christine Moreland, to whom Sylvia apparently attributed in large part the rift with her husband, was left the contents of certain buildings, together with the right of free rental of the buildings and the right to purchase them on the basis of a first refusal. The residue of the estate was devised in trust to Starr, Moreland and the Excelsior Trust Company as trustees for the benefit of the three Gould daughters. The trustees were directed to pay "so much or all of the net income of the Trust estate as the Trustees in their absolute discretion deem advisable to provide for the care, support, maintenance, education and welfare of * * * [the] children." As to each child, the trust terminated when she reached the age of 40 at which time she received an equal share of the corpus and undistributed income.

Starr was named executor and was also designated attorney for the estate and for the trust.

The will was executed while Gould was a patient at the University of Kansas Medical Center, a day or two before he underwent an operation which disclosed the presence of terminal malignancy.

Gould recovered from the operation and returned to his apartment where Christine Moreland attended him. On August 28, 1968, he entered Osteopathic Hospital. There he executed the three codicils to his will. The first, dated September 5, 1968, gave Ms. Moreland a coin collection in addition to provisions for her in the will. It also directed that Sylvia have no part in the arrangement of his burial and that Starr should have authority in that regard to be exercised according to Ms. Moreland's wishes. Ms. Moreland was authorized to consult the Gould children if she wished to do so. The codicil contained the following provisions:

"6. As many people know, there is deep bitterness between my wife and myself, and this bitterness has led to our separation and, had it not been for my health, to the divorce I am seeking. In spite of that bitterness, I have amply provided for my wife by the jointly held properties which I have created through my efforts, many of these efforts being prior to our marriage. My wife has prevented me from continuing to make an income by refusing to convey real properties and has substantially reduced, by these refusals, the amount of properties that I would have had at my death. In her bitterness, she has made unjust attacks on me, on my attorney, WAYNE R. STARR, JR., on CHRISTINE L. MORELAND, and on any other parties with whom I would come in contact. If any claim, complaint, attack or harassment is made by her upon CHRISTINE L. MORELAND, or upon EXCELSIOR TRUST COMPANY, or upon my attorney, WAYNE R. STARR, JR., for any reason whatsoever, I hereby direct WAYNE R. STARR, JR., my executor, to pay whatever sums, in his absolute discretion, in the defense of any complaint or claim against any of these three parties or against the estate. He is to have absolute discretion over the amount to

be expended for legal fees, whether to him or to any attorney that he may appoint. This provision shall be binding upon my estate through my executor, WAYNE R. STARR, JR., and binding upon the Gould Trust upon the three trustees, WAYNE R. STARR, JR., CHRISTINE L. MORELAND, and EXCELSIOR TRUST COMPANY. I will not have my wife, SYLVIA T. GOULD, giving attack on the aforementioned parties, whether in their individual capacity or as trustees, I direct and order, irregardless of the nature of such charges or harassment, true or untrue, my attorney and friend, WAYNE R. STARR, JR., as executor or trustee, have absolute discretion in the expenditure of funds of the estate or trust in defense of or payment of any attack or claims whatsoever upon these parties by SYLVIA T. GOULD, whether they be suits by her in Court or any other complaints that she may bring before any professional association, church group or any other organization or the public in general. This includes any complaints or any conduct in the past, present or future of any of the aforementioned parties, notwithstanding any other provisions of my will or codicil."

The second codicil, dated September 6, 1968, contained the following:

"2. I am concerned that my wife will make attempts to attack the will and first codicil and this second codicil and wish to reemphasize that my mind is clear and that had it not been for my health at this time, which is not affecting my mind, I would proceed with my divorce against my wife, and I am simply making disposition of my property as I have intended to do for a long period of time and want it clear that this is no sudden decision nor have I received any request from any party that the property be disposed this way, but simply dispose of it this way at my own request as my will. I wish and urge and direct my wife, SYLVIA T. GOULD, to accept my will. She has substantial joint property and the real estate has been left in trust under my will of January 2, 1968 for the benefit of the chil-

dren and I ask and request her to respect my will at least in my death, as she has not done during my life.

"3. I respect and trust my attorney, WAYNE R. STARR, JR., and have requested him to assume several roles concerning my estate. He is to be executor for my estate and attorney for my estate and one of the trustees of the Gould Trust for my children and attorney for this Trust of my children. In each of these positions, he is to receive reasonable compensation for his efforts, even though he is doing the work that might have been otherwise assigned to separate individuals. In short, I wish him to receive a full reasonable executor's fee, a full reasonable attorney's fee for the estate, a full reasonable trustee's fee as trustee of the Gould Trust and a full reasonable fee as attorney for the Trust and I do not want my wife SYLVIA T. GOULD to object to any of these dispositions made in this codicil or in the first codicil or in my will of January 2, 1968."

The third codicil, dated October 8, 1968, included the following:

"2. I have asked VIRGINIA CURTIS and CHRISTINE MORELAND to stay with me in the hospital during my illness. I want them to know that I appreciate their loyalty to me in spite of attacks upon them by my wife, SYLVIA T. GOULD. Because of these attacks by my wife, if it weren't for my request and urging, they would not have remained. To be sure that they and anyone else who SYLVIA GOULD directly or indirectly or through some third party or any other party may bring an attack upon them shall be protected, I, accordingly, hereby direct, demand and order my executor, WAYNE R. STARR, JR., to have absolute power to expend funds from the estate or from the Gould Trust in his sole and absolute discretion, either for attorney's fees to or for himself or to or for any other attorneys and have absolute discretion and power to expend funds for any other expenses including, at his absolute discretion, the settlement of any claims by anyone,

whether directly or indirectly related or unrelated to SYLVIA T. GOULD for attacks made upon my friends, VIRGINIA CURTIS, TONY CURTIS, WAYNE R. STARR, JR., my attorney, or members of his staff, EXCELSIOR TRUST COMPANY, or members of its staff, CHRISTINE L. MORELAND, or any other parties whom my friend and attorney, WAYNE R. STARR, JR., in his absolute discretion, feels should have this protection. My Will or my two codicils notwithstanding, this power is to be absolute in the hands of my attorney, WAYNE R. STARR, JR., both as to funds of the estate and as to the funds of the Trust and the two other trustees will be limited in their power as joint trustees in that they shall have no discretion concerning expenditures of Trust Fund expenses for any of these attacks, which discretion solely remains in the hands of my attorney WAYNE R. STARR, JR., both as to the amount to be expended and as to the individuals to be protected, regardless of whether the attacks are just or unjust, regardless of what party brings the attack and regardless of to whom the attack is directed.

"3. Because my wife, SYLVIA T. GOULD, has refused my offer for her to have twenty percent of our joint property outright and for me to have twenty percent of our joint property outright, with sixty percent of the estate to go in Trust for my children, I wish, and so direct my executor WAYNE R. STARR, JR. (sometimes referred to as WAYNE R. STARR), to expend funds liberally in defense of claims by my estate against any properties which have any possibility, however remote, of being the property of the estate rather than the property of SYLVIA T. GOULD, regardless of whether this property is jointly held or not, including but not limited to funds which are on deposit in the Clay County Circuit Court which are the proceeds from condemnation action, most of which is from non-jointly held properties and should accordingly go into my estate and not to SYLVIA T. GOULD."

Starr qualified as executor, without bond, as called for in the will, and proceeded to administer the estate. Assembling and inventorying the assets was a problem because Doc had handled his affairs in a devious manner. The problem of the executor was complicated by Sylvia's hostility, evidenced in part by her attorney's direction, at her request, that Starr communicate with her or the children only through her attorney.

On December 23, 1968, Sylvia filed an action to quiet title to personal property against Starr as executor. In its memorandum upon the dismissal of this petition in December, 1975, the court described the petition as follows:

" * * * That petition asserts that various named items of personal property, including contents of an apartment house, personal property in a warehouse, horses pastured on property in Clay County, coins and stamps, a condemnation award, and other items which were inventoried and claimed as assets in the probate estate of Elmer A. Gould, deceased, were actually the property of the plaintiff, the claim being that she and her husband held such items of personal property as tenants by the entireties. * * * "

Starr wrote Mrs. Gould and her attorney, suggesting that some plan might be worked out whereby the expenses of the girls' education might be worked out while the estate was being administered, but he received no response to these suggestions. Mary Elizabeth, 16 years old at the time of her father's death, Patricia, then 12, and Joan, 8, were students at Catholic schools. According to them, their mother was hard pressed to meet their educational and personal needs. None of the children discussed the family financial situation with Starr.

On December 4, 1969, Starr as executor had made application to the probate court for an order of partial distribution of $5000 to the trust. The application recited: "That the payment of a partial distribution will allow the trustees, if they desire, to pay

the present educational expenses of the children and to possibly assist the estate in settling a number of problems which concern the estate as well as the trust." (As originally prepared, the application sought distribution of $35,000 and was changed by interlineation to $5,000.) The application was approved and an order of partial distribution for payment of $5,000 to the trust was made by the probate court on the date of the application. No distribution was made at that time.

On December 17, 1969, the Excelsior Trust Company notified Starr that it declined to serve as co-trustee of the Gould Trust. Starr and Moreland, in accordance with the terms of the trust instrument, selected Elwyn L. Cady, Jr., an attorney, to replace the trust company as trustee. A trustees' memorandum, dated December 3, 1969, and signed by Starr and Moreland, had recited a decision on the part of the trustees to bring an action to determine the competency of Sylvia Gould to manage her affairs. The memorandum authorized payment of a $30,000 retainer fee to Starr "with the understanding that when the matter is completely concluded and all appeals have been made that will be made and the matter is fully adjudicated that he will render a statement to the Trustees of the problems involved and under the 'absolute power' provision, will set a reasonable fee considering the extreme anguish and bitter attacks of this woman and the complex problems of presenting an action for incompetency." Because he had previously relied upon Cady as a medical-legal consultant in an unrelated matter, Starr discussed with Cady the proposed action regarding Mrs. Gould's competency. Ms. Moreland became acquainted with Cady through Starr. She suggested to Starr that Cady be named the successor trustee and Starr agreed.

On June 15, 1970, Starr as attorney for the trust addressed the following letter to Mrs. Gould:

"Your husband insisted that there be no accounting to you of the Trust and I insisted otherwise and put in the will that there be a reasonable annual accounting to you of the Trust's incoming (sic) expenditures. As you know, there has been no distribution from the Estate to the Trust and, therefore, nothing to spend. There are no receipts and no expenditures as of this date.

"I do think that there should be a small partial distribution to the Trust in order to pay your children's education expenses and particularly those of your daughter who may wish to go on to college at this time. You have forbidden me to communicate with your children and I would appreciate it if you, or somebody representing you, or the children, would contact me and perhaps we may be able to assist these children so that during the turmoil that is going on they will not be prevented from receiving good and needed education.

"I will write you again concerning the Trust sometime during the first part of June next year with another accounting."

Early in the administration of the estate, the executor had been authorized to take charge of the decedent's real property. On November 26, 1969, Starr as executor had contracted with Charles Garney to sell approximately 76 acres of land owned by Gould in Clay County in the vicinity of Vivion Road and Highway 169 for $114,270. The probate court approved the sale and the transaction was consummated.

On June 17, 1970, Starr as executor and the trustees contracted with Garney for the sale of approximately 148 acres across the road from the first tract for $500,000. As a part of the transaction the trustees executed a promissory note to Garney for $60,000, evidencing a loan from Garney to the trustees of that amount, conditioned upon the completion of the sale. The note further provided that the trust through Starr would provide legal assistance to re-zone the tract and to assist in obtaining an interchange at Highway 169 and Vivion Road.

Approval of the sale by the probate court was sought and obtained. The court was not advised of the loan arrangement.

On June 19, 1970, a check for $60,000 to the trustees from Garney was deposited in the E. A. Gould testamentary trust in the Noland Road Bank. On the same date the trustees met and, according to the trustees' memorandum of that date, Cady and Moreland agreed:

1. That Starr should receive "a legal and negotiating fee" of 2% of the sale price of all land sold for benefit of the trust. A $10,000 fee for the second sale to Garney and a $2,295.40 fee for the first were approved.

2. That Starr should receive a fee of $100 per acre for his effort toward obtaining rezoning of the second Garney tract, for a total fee of $14,830.

3. That Starr be paid $4500 for 150 hours of legal research not compensated by the estate.

4. That Starr be paid $6500 for legal work in rezoning a 65-acre tract known as the Covington Place.

5. That Starr should be paid a fee of $35,000 for his services in connection with the action filed by Sylvia in the Jackson County Circuit Court.

By separate memoranda of the same date Cady and Starr agreed that Moreland should receive $1000 per year for her services as trustee, with $1000 payable then for the first year. Moreland and Starr agreed that Cady should receive $1361 for legal service in behalf of the trust to that date.

On June 19, checks were drawn on the trust account for $40,000 payable to Starr, $1000 to Moreland and $1361 to Cady. Each of the checks was signed by the two trustees not the payee of the checks. On June 23, Starr drew a check on the account for $257.50 to pay for a lawnmower for use on estate property. On June 24, he drew a check payable to himself for $17,300.

On July 7, 1970, Starr as executor filed an application in the probate court for partial distribution of $15,000 from the estate to the trust. The application included the following:

"There are many needed things that need to be done by the trustees for the minor children and it is important that a partial distribution of Fifteen Thousand Dollars ($15,000) be made to the trust at this time."

The request was approved and $15,000 deposited in the trust Noland Road Bank Account on July 8, 1970. A check dated July 7, 1970, payable to Starr for $15,000 for "Attorneys' Fees," signed by Starr and Cady was drawn on the account and paid to Starr.

Between September 22, 1971 and February 17, 1972, $4000 was transferred from the estate to the trust, presumably pursuant to the $5000 order of partial distribution of December 4, 1969. Disbursement of $1,000 was made to Moreland January 21, 1971 for trustee's fee, $2,000 to Starr December 6, 1971 for attorney's fees and $1,000 to the Diocese of Kansas City for children's schooling on February 17, 1972.

In June, 1970, Starr as executor had sought and obtained an order adding the trustees in their representative capacities as defendants in the circuit court action brought by Sylvia. Sylvia at that time and subsequently represented herself, her attorney having withdrawn in January, 1970.

Starr as executor sought the appointment of a guardian ad litem to represent the children's interest in the litigation. On July 7, 1970, I. Lee Kraft was appointed guardian ad litem for the children. In November, 1970, pursuant to Kraft's motion, the children were permitted to intervene as parties defendant in the case.

On November 16, 1970, Kraft's law office wrote Starr and, among other matters, noted the orders for payment of $20,000 to the trust from the estate and requested an accounting of the trust affairs. The request was repeated December 1, 1970 and again in February, 1971, after Kraft had received some information concerning the 2% fee on the land sales. In response to this letter, Starr replied:

"You also request in your letter of February 18, 1971 a list of expenses pertaining to

the $20,000 which is actually $15,000.00. I have explained that as attorney for the Trust, I have been handling a number of matters including the sale of the two lands at an agreed legal fee for negotiations of 2% of the two sales. The Trustees did not at the time obtain a court order in Circuit Court because Mrs. Gould was unrepresented by counsel and because her delaying tactics and unreasonable conduct would further damage both the Estate and the Trust, as they have done substantially anyway. We also felt the Trust should have an active role in any sales of land as they are the legal title holder, a party to the sale contracts with the Estate and furnished Trustees' Deeds at the request of the title companies.

"We, however, have planned and will furnish annually an accounting and Mrs. Gould received an annual accounting on June 15, 1970, a copy of which is enclosed. Obviously, at that time, there were no funds in the Trust although the Trustees were active from his death, because of the burdens placed upon them in the will and because of the substantial litigation involved which substantially affect the Testamentary Trust. Also there is a recognition that because of the bitter opposition of Sylvia Gould, we all wanted to be sure that whatever was done in the Estate or the Trust met with the unanimous approval of all of the Trustees as well as the Executor of course.

"Elwyn Cady received $1,361.00 in fee application for some work that he did involving the Trust, although most of the legal work of the Trust was handled by me.

&ast; &ast; &ast; &ast; &ast; &ast;

"Christine Moreland has been paid two $1,000.00 payments for her work as Trustee and in assisting with the many problems of the Trust and Estate including helping in locating some of the assets involved. This is an involved matter and obviously needs to be discussed in detail and, of course, is subject to, as are the other expenditures, rule by the Circuit Court as to its reasonableness and to refund if ruled improper as are the other expenditures. Obviously, the Trustees felt these expenditures are fair and reasonable or they would not have been made.

"There is a $10.64 bank charge for checks, most of which are unused.

"The balance of the Trust Account at this time is $70.86 and all other funds were paid to me. In short, I received the difference between the above expenditures and $15,000.00 or $11,300.00 from these monies."

In December, 1971, a hearing was held in the probate court on the removal of Starr as executor. Ms. Moreland testified at the hearing. According to her, before she testified she was advised by both Starr and Cady to say nothing about the $60,000 Garney loan. At the hearing, she testified evasively about the account, stating that the trust "could have had" more than $15,000 but that she was not positive of the amount. At that hearing, Starr was asked about the statement in his February 24, 1971 letter to Kraft, to the effect that $15,000 had been placed in the trust. When asked whether $15,000 was the only money that had gone into the trust at that time, Starr replied: "We have added some since."

The $60,000 Garney loan and its disbursement came to light for the first time on June 11, 1973, when the trustees submitted to Kraft a "complete accounting" of the trust, which included the Garney loan.

In April, 1973, a cross-petition was filed in behalf of the Gould children against the trustees in such capacity and also as individuals. An amended cross-claim by and on behalf of the children was filed October 16, 1974. It was in three counts. Count I sought removal of the trustees, an accounting, judgment against the trustees for the $19,000 received from the estate ostensibly for the benefit of the children and expended for legal and trustees' fees, for the $60,000 represented by the Garney note in the event that the court, in a separate action by

the administrator ad litem, found that the note was a valid obligation of the trust, and appointment of new trustees. Count II sought punitive damages against each of the defendants of $50,000. Count III alleged that the sale of the Garney property was for $761,000 less than the fair market value of the property and sought judgment against the defendants in that amount.

After Mrs. Gould's petition to quiet title had been dismissed on motion of the administrator ad litem on grounds that the matters there asserted were in the sole jurisdiction of the probate court (the dismissal was designated a final order for purpose of appeal but no appeal was taken), Counts I and II of the cross-claim came to trial.

At the conclusion of the trial, the court entered judgment removing the trustees and naming the United Missouri Bank of Kansas City as trustee, ordering the trustees to pay the sum of $1,070.86 in their hands and all other trust assets in their control or possession to the successor trustee; disallowing the accounting filed by the trustees except for three items ($1000 paid for girls' schooling, $257.50 for lawnmower and $10.64 for checks); surcharging the removed trustees with all expenditures for trustees' and attorneys' fees totalling $18,500; assessing punitive damages against Starr and Cady of $50,000 each and against Moreland of $500. The court also surcharged the removed trustees with expenditures for trustees' and attorneys' fees of $59,661 from the Garney loan, but the court retained jurisdiction of that part of the judgment for modification or adjustment in the light of the pending action to declare the loan invalid.

The court made an extensive memorandum of its findings of fact and conclusions of law. It concluded that the "trustees acted in an arbitrary and capricious manner, reflecting their improper motives, bad faith and want of fidelity to a degree amounting to wilful and wanton abuse of discretion in the execution of the trust imposed upon them."

The breaches of fiduciary responsibilities consisted of:

1. The trustees disregarded the testator's primary purpose to provide for his children and pursued a course of conduct designed solely for the benefit of Ms. Moreland and Starr.

2. The trustees disregarded the terms of the trust and exceeded their authority in authorizing and permitting the expenditure of trust funds relating to the incompetency of Mrs. Gould, paying commissions to Starr for the Garney land sales, compensating Moreland for assisting in assembling the estate assets and in paying Starr for legal services for benefit of the Garney interest.

3. The compensation paid to Starr was excessive and not predicated on benefit to the trust and payment to Starr for legal services in advance without requiring accountability was violation of fiduciary responsibility.

4. The trustees deliberately concealed their activities and wilfully failed to account to Mrs. Gould as required by the will or to the guardian ad litem.

5. The trustees engaged in self dealing and conflicts of interest, evidenced by Moreland's primary concern with her own legacy and by Starr's interest in continuing the fight with Sylvia in order to obtain more compensation. Cady and Moreland abdicated all responsibility to Starr and accepted trust money for work on the competency of Sylvia, a matter outside the purview of the trust.

6. The trustees kept completely inaccurate records of receipts or expenditures.

7. The trustees took excessive and unjustified amounts as compensation.

8. The trustees fostered the hostilities that existed between them and the Gould children.

9. The trustees' breach of fiduciary duties was so wilful and wanton as to require that they be denied compensation for their services and be surcharged for the amounts received, plus punitive damages.

In its memorandum the court considered at length the defense that the absolute powers granted Starr by the will authorized the action taken by him and justified the failure of the co-trustees to exercise discretion in such matters. The trial court concluded that, taking the will and its three codicils together, the testator intended that Starr should have only reasonable compensation for his services in defense of the attacks by Sylvia. The court also concluded that the absolute powers granted Starr with respect to his legal services were unenforceable because it is against public policy for a testator to require that a trustee employ as his attorney a person designated by the testator. The court also concluded that the absolute power granted Starr to fix his own fees conflicts with established law prohibiting self dealing and conflicting personal interest on the part of a trustee.

The trial court declared its judgment final for purpose of appeal. Rule 81.06. Each of the trustees has appealed. Their appeals have been consolidated. This court has accepted the trial court's declaration of the finality of the judgment for purpose of appeal.

■ On their appeals, the trustees rely primarily upon the position that the will of Doc Gould conferred absolute power and absolute discretion upon Starr to determine the amounts to be paid to the trustees and to attorneys for the trustees, including Starr, and that the trial court had no authority to deny them compensation which Starr had fixed and paid in accordance with the terms of the will. The appellants attack the court's finding that the provisions of the will according Starr absolute discretion regarding fees is contrary to public policy and void and they also object to the trial court's construction of the will and codicils which resulted in the conclusion that, in any event, the amount of fees was required to be reasonable.

■ The shortcoming of these arguments lies in the failure on the part of the appellants to refute the further significant findings of the trial court that the trustees' decisions were based upon improper motives, were the products of bad faith and amounted to a wilful and wanton abuse of discretion. No grant of absolute power or discretion can authorize a trustee to act dishonestly. I Restatement of Trusts (2d) § 187, comment f, p. 403 (1959); III Scott on Trusts, § 187.4, pp. 1521–1523 (1967). That Starr did so act has been judicially determined. The deception which he practiced or attempted "upon the Probate Court, the Circuit Court, the Guardian of the minor children and the Administrator ad Litem of the Estate" in the transactions here under review has been found to have been "inconsistent with those professional standards demanded of the members of the bar of this state" and caused his disbarment as an attorney. *In re Starr*, 538 S.W.2d 334, 335 (Mo.banc 1976). They have been found to have constituted misconduct as executor of the Gould estate, authorizing his removal as executor and the denial of compensation for services in that capacity. *In the Matter of the Estate of Gould*, 547 S.W.2d 863 (Mo.App.1977). In that case it was noted that the "considerable discretion and authority with respect to his administration and fees" given Starr " * * * did not * * * give him authority to practice deceit or profit from wrongdoing." 547 S.W.2d 869.

It is impossible to separate the activities of Starr as executor, which resulted in his removal from that position, from those of Starr as trustee. The applications for partial distribution which were couched in language designed to deceive the probate court as to their true purpose were for the benefit of Starr as trustee. He obviously could not be aware of that fact as executor and unaware of it as trustee.

In his application for the approval of the Garney sale, Starr as executor deliberately refrained from advising the probate court of the side deal involving Starr as trustee. At the hearing on his removal as executor,

Starr answered less than truthfully questions which might have led to discovery of the Garney loan and to the disposition of its proceeds.

In addition to dealing dishonestly with the probate court, Starr was equally deceptive in dealing with the representatives of the children who were entitled to the benefit of the trust estate. His communication to Mrs. Gould of June 15, 1970 made no mention of the fact that an order of distribution was then in existence which authorized the transfer of funds from the estate to the trust. The date of this communication is not lacking in significance, coming as it did two days before the Garney contract was entered into. That transaction obviously was planned to make a sizable sum available to the trust estate.

When, after repeated demands by Kraft as guardian ad litem of the children, Starr, on February 24, 1971, purported to account for the trust activity, he omitted any reference to the Garney loan. The letter was couched in terms designed to leave the impression that at that date Starr had received $11,300 from the trust estate, rather than $65,300 which he had actually received by that time. The letter indicates that copies of it were also sent to Judge O'Leary of the Jackson County Circuit Court and to Judge Berry of the Probate Court, an obvious continuation of efforts to mislead the judicial authorities concerned with the trust and the estate.

 Starr on this appeal questions the finding of the trial court that he was required to account to the mother of the minor beneficiaries. The will provided:

"10. The Trustee shall render an account once each twelve (12) months to the guardian, if any, or parent (in the case of a minor having no guardian) for each beneficiary who is then receiving or entitled to receive income hereunder subject to the Trustee's absolute discretion. By this Trust provision or any other provision of this Will, I do not give my wife the right of approval or any other power over the Trustees."

This language is not free from doubt. However, in view of the fact that income was payable to the beneficiaries in the "absolute discretion" of the trustees, that language in the just quoted clause of the will may properly be considered referable to the exercise of discretion in that respect rather than with respect to providing the accounting which a trustee is by law obligated to make.

Starr's letter of June 15, 1970 to Mrs. Gould states that, over Doc's objection, provision was made in the will for "a reasonable annual accounting to you of the Trust's incoming (sic) expenditures."

Starr's letter of February 24, 1971 to Kraft states that he planned to make an annual accounting to Mrs. Gould, a decision that hardly would have been likely if Starr had considered that he was not required to render an accounting.

Other findings of the trial court of abuse of discretion and disregard of fiduciary obligations on the part of the trustees are fully supported by the evidence. There can be little doubt that the interests of the children were given little attention by the trustees. The finding that assistance to the children was the "primary" purpose of the trust is disputed by appellants. Starr in his reply brief argues that the third codicil in particular evidences an intention that protection of the persons therein named from attacks by Sylvia was to be "the main objective of the administration of the estate and the trust * * *." If Starr's applications for partial distribution are considered, it is obvious that he felt that for such purpose the assistance of the children should be emphasized. Regardless of whether the word "primary" was properly applicable, it is clear that Gould sought to provide for his minor children and that the trustees' activities in that regard were small, producing a minimal contribution when Starr's position became jeopardized.

The conflicts of interest and self dealing by the trustees were evident. Ms. Moreland stated that she would step down as

trustee if her legacy was paid to her. She stayed on as trustee "Because I felt they would forget me." Starr's primary concern was with his fees. Cady apparently assumed a detached role, taking the position that his duty as trustee was merely to see that Starr's decisions were consistent with the purposes of the trust. Apparently he considered himself primarily a medicolegal consultant rather than a fiduciary with the obligation attendant upon such position.

■ Even if the "absolute powers" provision of the third codicil is given the meaning claimed by the appellants, the discretion there conferred upon Starr related only to the defense of attacks by Sylvia. It cannot, in any event, justify the 2% fee for the Garney sales and the fees for the zoning matters. The fee for the Garney zoning work was ostensibly tied in with a provision of the contract authorizing Garney to rescind the sale in the event rezoning was not obtained. According to the evidence, Starr did little if anything to obtain a rezoning and the rezoning problem simply "drifted away." Nothing of significance was done toward rezoning the Covington tract for which a fee of $6500 was paid Starr. There was no evidence of any effort to ascertain whether or not those expenditures were necessary and beneficial to the trust. The trustees had no right to fix the compensation for Starr for those services. *Morrison v. Asher,* 361 S.W.2d 844, 851[11–15] (Mo. App.1962).

The dispositive issue in this case does not revolve around the right of a testator to bestow unlimited power upon a trustee of his estate. Rather, it revolves around the standard of conduct which the law demands of the trustee who is the recipient of such authority. Had Starr applied to the probate court for a partial distribution of $15,-000 to be used to pay himself a fee for acting as attorney in defense of Sylvia's attack, an issue might have arisen which would eventually have required a judicial construction of the meaning to be given the grant of authority to Starr under the will.

Such was the situation in *In Re Ellis' Estate,* 66 Ohio App. 121, 32 N.E.2d 23 (1940), relied upon by appellant Starr. In that case, the court gave effect to a provision in a will by which the executrix who was also an attorney was authorized to pay herself for extraordinary services to the estate, the executrix to be the sole judge of the value of such services. The executrix took credit for an amount in excess of the statutory limit without prior approval of the court. The widow who had taken against the will objected to allowance of the credit as to her share of the estate. Noting that no question of abuse of discretion, fraud or bad faith was involved and that the validity of the provision as a matter of public policy was not properly before the court, the allowance to the executrix was upheld, basically on the grounds that the testator had the right to dispose of his property as he saw fit. That case is no authority for disapproval of the action of the trial court in this case.

Likewise, cases such as *Clark v. Mississippi Valley Trust Co.,* 360 Mo. 452, 228 S.W.2d 808, 812[2–5] (1950), and *Lyter v. Vestal,* 355 Mo. 457, 196 S.W.2d 769, 772–773[5] (1946), recognizing the right of a testator to grant discretionary authority to the trustee of a trust established by his will, are not here controlling because of the bad faith and dishonesty on the part of the recipient of the discretionary authority. *Lyter,* supra, recognizes that a grant of discretionary authority may not be used as a cloak to avoid responsibility for dishonesty. See also *Bakewell v. Mercantile Trust Co.,* 319 S.W.2d 600, 606 (Mo.banc 1958).

■ The evidence clearly supported the trial court's action in removing the trustees. In fact, only Cady specifically objects to the portion of the judgment relating to the removal of the trustees. His position is based upon the proposition that the trustees could be removed only for refusal to permit inspection of the records of the trust, failure to bring all financial data of the trust to the chancery proceeding, violation of

mandatory or discretionary absolute powers granted the trustees or self dealing or conflict of interests contrary to the law of trusts. He argues that a prima facie case for removal had not been made by the cross-claimants and that, therefore, his motion for judgment at the conclusion of the evidence should have been sustained.

His arguments on the first two propositions ignore the terms of the trust which required an annual accounting. That provision has been referred to above.

There was evidence that Cady aided Starr's effort to conceal the facts regarding the status of the trust and expenditures by the trustees. According to Ms. Moreland, when she appeared for the hearing on the removal of Starr as executor, Cady advised her to say nothing about the Garney loan. Cady did not accept the responsibility imposed upon him as a trustee. For example, he stated that his obligation as co-trustee was to see that Starr acted within the ambit of his "absolute discretionary powers." Apparently he was willing to ignore the provisions of the will which conferred powers upon the trustees as a group. Contrary to Cady's contention, the only ground for his removal was not hostility between the trustees and the beneficiaries. Whether or not there was such hostility in this case as would, standing alone, have called for removal of the trustees need not be decided. There was evidence of lack of fidelity to duty and breach of trust which supported the trial court's action, and, specifically, in the case of Cady.

■ Inasmuch as the trustees were removed because of breach of duty involving improper motives and bad faith, the court properly held that they were not entitled to compensation for their services as trustees. *Morrison v. Asher*, 361 S.W.2d 844, 851 [11–15] (Mo.App.1962). The bad faith and dishonesty of Starr preclude his reliance on the absolute power granted to him and Starr's dereliction supports the court's requirement that he repay the compensation allowed to him as attorney's fees.

■ Ms. Moreland has objected to imposition of liability upon her as to the $15,000 paid Starr on July 7, 1970 and a $250 payment on July 30, 1970. As to both items, she asserts that the payment was not made by her as trustee and as to the first she also asserts that such payment was authorized under the absolute power provision of the third codicil and that the surcharging of the account for this item was based upon the erroneous construction of the third codicil in the light of the will itself and the first and second codicils and was based further on the court's erroneous conclusion that the absolute power provision was void as against public policy.

As above pointed out, the court's surcharging the accounts of the trustees was based upon their bad faith and wanton mismanagement of the trust estate and the surcharge is supported on that basis without regard for the meaning or validity of the absolute powers language of the third codicil.

As for her contention that she should not be held liable for the $15,000 and $250 payment because she did not make the payment, Ms. Moreland points to the fact that she signed neither of the checks payable to Starr for these items and she says that she knew nothing of the $250 payment when it was made. As to the $15,000 payment, she contends that she expressly disapproved of it. She testified that Starr brought the $15,000 check from the executor to the trustees for her endorsement which she placed on the check. She testified further that Starr told her that he was applying the check for his attorney's fee and she told him that he "had better not."

Ms. Moreland had in fact given her prior approval for this payment. By the trustee's memorandum of June 19, 1970, she and Cady as trustees had approved payment to Starr of fees totalling some $73,125. She had signed the check payable to Starr from the Garney loan for only $40,000, leaving some $33,125 authorized to Starr unpaid. Starr subsequently paid himself $17,300 of

this amount, but $16,275 of the amount authorized remained unpaid at the time of the July 9 transaction. Her "You had better not" when Starr announced his plans to apply the $15,000 to his fee cannot avoid her responsibility based upon her prior formal approval of the expenditure. *Morrison v. Asher,* supra.

Appellant Starr in his brief (in which appellant Cady joins) contends that the trial court erred in holding that the trustees were liable for a $5,639 note from Starr payable to Gould.

On April 24, 1968, Starr had given Gould a promissory note for $5,639.93, payable in two years. The note provided that in the event of Gould's death, the amount of the note would be owed "his children's testamentary trust * * *." The executed note was last seen in Gould's possession. Starr had an unexecuted copy, Moreland had seen the original note at Gould's place of business prior to his death. After Gould's death, Starr mentioned the note to Ms. Moreland. She also told Cady about it. However, the original note was not seen after Gould's death. After Gould's death, Starr expressed the opinion that the note should be considered part of the trust estate but the trustees made no record of the obligation and did not include it as a trust asset.

The trial court pointed to the failure to account for the note as part of their dereliction in rendering accounting to Mrs. Gould and the guardian ad litem. However, the judgment includes no imposition of liability for the handling of this item so there is no basis for the claim of error now urged.

Appellant Starr contends that the trial court erred in permitting the cross-claimants to read into evidence from Starr's testimony in the probate court proceedings and from Starr's deposition. Appellant contends that none of the statements constituted admissions on the part of Starr and that the cross-claimant should have been required to call Starr, who was present at the trial, as a witness.

Some eighty pages of the transcript on this appeal are taken up by the objected to method of proof relied upon by the cross-claimants. Much of the space is devoted to numerous objections by Starr's counsel and colloquies regarding such objections. It would serve no good purpose to recite at length the various matters included in the questions and responses. However, appellants' claim that none of the statements constituted admissions is unsupportable. There were, for example, questions and answers which disclosed the secret nature of the Garney loan and the failure to disclose the transaction in probate and circuit court proceedings, the real purpose of obtaining the partial distribution of July, 1970, purportedly obtained to assist the children, the fact that the only assistance provided the children was the $1000 paid in 1973, the concealment of trust transactions from the guardian ad litem, and the handling of the Starr note. The testimony on these matters did constitute admissions within the test laid down in *White v. Burkeybile,* 386 S.W.2d 418, 422[2–4] (Mo.1965).

It is difficult to see how some of the testimony objected to constituted admissions. However, on a court tried case such as this, it is practically impossible to predicate reversible error on the erroneous admission of evidence. The party advancing that contention must demonstrate the absence of sufficient competent evidence to support the trial court's decree. *Pelligreen v. Century Furniture & Appliance Co.,* 524 S.W.2d 168, 170[1–7] (Mo.App.1975). There has been no such showing here. Any improperly received testimony was, as this case now stands, harmless error. *Bashor v. Turpin,* 506 S.W.2d 412, 421[8] (Mo.1974).

Appellant Cady attacks that portion of the trial court's memorandum entitled "Construction of the Will." This matter need not be pursued inasmuch as the decree of the trial court, as has been pointed out above, is supported without regard for the process which it employed in construing the will and codicils.

His objection that denial of the right of a testator to make disposition of his property in the manner employed by Gould in conferring absolute powers upon Starr runs afoul of constitutional guaranties likewise need not be pursued.

Cady also objects that the trial court failed to give the trustees the benefit of the presumption of good faith to which they are entitled. This error is bottomed upon the absence of rebutting evidence. Since there was, as has been demonstrated, rebutting evidence, the presumption "took flight." *State ex rel. Christian v. Lawry,* 405 S.W.2d 729, 730–731[1–5] (Mo.App.1966).

There remains the problem of the imposition of punitive damages to which appellants, of course, object.

The cross-claim on which the cause was heard was in three counts. Count I sought an accounting, surcharge of accounts and removal of the trustees. Count II adopted the allegations of Count I, alleged that the acts of the trustees were wanton and malicious and sought punitive damages of $50,-000 against each of the trustees. Count III related to the Garney transaction. When the court set the matter for trial, it noted that "Counts II and III * * * may well involve disputed questions of fact to which either party would be entitled to a jury trial."

When the trial began, it was agreed that Counts I and II should be tried together and Count III was reserved for later trial. No request was made for jury trial on Count II.

At the conclusion of the trial, the court in its judgment assessing punitive damages stated that in that respect it was sitting as a court of law, a jury having been waived.

Appellant Starr (Appellant Cady has joined in and adopted Starr's brief on this matter) contends that the trial court erroneously held that a jury trial was waived because there was no such waiver of record. However, if the issue was one upon which the appellants were entitled to a jury trial, they waived their right in that regard by proceeding to trial without objection. Rule 69.01.

Appellants assert alternatively that they were not required to request a jury, that the cross-claim in all respects as to Counts I and II stated a claim in equity and that the court, sitting in equity, had no power to award punitive damages.

As above noted the trial court considered the punitive damages claim as a law, not as equity, claim. Respondents here support that position but contend further that even if the matter was an equitable one, the court had the power to award punitive damages.

A claim for punitive damages is not a separate cause of action, although stated in a separate count in this case. "Exemplary damages do not and cannot exist as an independent cause of action, but such damages are mere incidents to the cause of action and can never constitute the basis thereof." *Cook v. Atlantic Coast Line R. Co.,* 183 S.C. 279, 190 S.E. 923, 924[3] (1937). The only cause of action stated in this case was one in equity. Therefore, the right to punitive damages must depend upon the power of the court sitting in equity to award such damages.

Missouri courts have not reached a clear, reasoned rule on this point. The most recent pronouncement of the Supreme Court is equivocal. In the case of *Bellerive Country Club v. McVey,* 365 Mo. 477, 284 S.W.2d 492, 503[15, 16], (banc 1955), the court stated:

"As noted, plaintiff, as ancillary to injunctive relief, sought actual and punitive damages. It has been generally held that equity will not award punitive damages. 25 C.J.S., Damages, § 117, p. 709. We have found no Missouri case on the proposition. It is, however, the law in Missouri that the allowance of punitive damages is always discretionary. *Mitchell v. Pla-Mor, Inc.,* Mo., 237 S.W.2d 189. Consequently, with-

out holding that a court of equity may never award punitive damages, we are of the opinion that the proper exercise of a sound discretion prevents the assessment of punitive damages under all the evidence in the instant case."

In *Chandler v. Howard,* 312 S.W.2d 26, 32 (Mo.1958), the court noted the problem but did not pass on the question since punitive damages in that case were assessed on a claim at law, which was joined with a claim for equitable relief and the matter heard on a jury waived trial.

In *Thompson v. Hodge,* 348 S.W.2d 11, 15[11] (Mo.App.1961), the court, noting the *Bellerive* case, observed that the allowance of exemplary damages by an equity court "is at least a matter of doubt * * *."

Cases from other jurisdictions are not in accord on this question. A large number of cases have been compiled in an annotation: "Power of equity court to award exemplary or punitive damages." 48 A.L.R.2d 947.

As observed in *Bellerive,* the probable numerical weight of authority denies the power of a court of equity to award punitive damages. The bases for such position have been generally stated as follows: "(1)[A] court of equity does not have the power to award such damages in the absence of a statute expressly granting it the power; (2) the award of such damages is incompatible with the principles and practice of equity; and (3) by seeking equitable relief, a litigant waives all claims to punitive damages." 22 Am.Jur.2d Damages, § 239, pp. 326–327 (1965).

The Supreme Court of Oregon recently held that a court of equity had no authority to award punitive damages. *Pedah Company v. Hunt,* 265 Or. 433, 509 P.2d 1197 (1973). In that case the court said:

"The great weight of authority denies the recovery of punitive damages in a suit in equity. It appears to us that the allowance of punitive damages by a court sitting in equity, without a jury, is inconsistent with a court in equity doing justice between the litigants." 509 P.2d 1199.

See also *Karns v. Allen,* 135 Wis. 48, 115 N.W. 357, 360 (1908).

In other jurisdictions, such limitation upon the authority of a court sitting in equity has been denied. Most recently the principal basis for rejection of the rule has been the abolition in modern procedure of the distinction between law and equity. Among such cases are *I. H. P. Corp. v. 210 Central Park South Corp.,* 16 A.D.2d 461, 228 N.Y.S.2d 883 (1962), aff'd 12 N.Y.2d 329, 239 N.Y.S.2d 547, 189 N.E.2d 812 (1963); see note, 63 Colum.L.Rev. 175 (1963); *Charles v. Epperson & Company,* 258 Iowa 409, 137 N.W.2d 605, 618[26][27, 28] (1965); *Glusman v. Lieberman,* 285 So.2d 29, 30–31[1, 2] (Fla.App.1973).

In the absence of more definitive holding by the Supreme Court than that represented by the *Bellerive* case, this court considers that the last cited cases have approached the question here involved in a manner more consistent with the rules of procedure in this state (Rule 42.01) and it is concluded that the argument that the trial court here had no authority to award punitive damages is without merit.

Appellant Starr argues that he should not be subjected to punitive damages because he acted pursuant to the absolute powers granted him under the will. For the same reason that this contention has been rejected above it is rejected on this score. The so-called absolute powers cannot be used as a cloak for dishonesty and, as above shown, some of Starr's wrongful acts were not in the area where he was given such power. Appellant Cady has not briefed the issue of his conduct insofar as the question of punitive damages is concerned. Appellant Moreland does argue that her conduct was not such as to warrant the imposition of punitive damages against her. The trial court's finding that her actions as trustee were motivated by self-interest is supported by evidence and is adequate to sustain the award of punitive damages against her.

Judgment affirmed.

All concur.